L. F. Ratterman and Claribel Ratterman v. Commissioner. L. F. Ratterman v. Commissioner.
Ratterman v. Commissioner
Docket Nos. 11319, 11913 and 12080.
United States Tax Court
1948 Tax Ct. Memo LEXIS 142; 7 T.C.M. (CCH) 476; T.C.M. (RIA) 48130; July 6, 1948
*142 1. Upon the evidence, held, the respondent did not err in including in gross income for the years 1937 through 1940 certain amounts as representing income received from two corporations, 2. Upon the evidence, held, the respondent erred in disallowing certain deductions for office, advertising and travel expenses for certain years and did not err in disallowing deductions for club dues and for certain other years the respondent's determination is sustained for lack of proof. 3. Upon the evidence, held, that payments of $13,500 received by petitioner in 1940 from a law firm was not a gift but was in effect a splitting of fees and petitioner should have returned the amount as a part of his gross income. The Commissioner did not err in including it in his gross income. 4. Upon the evidence, held, that of a payment of $3,999.14 received by petitioner in 1940, $1,948.29 represented repayment of advances which petitioner had made to a former lawyer associate in prior years for the purchase of office furniture and other purposes and was not income to petitioner. The balance of the payment represented a gift to petitioner and was not taxable income to him. 5. Upon the evidence, held, *143 the respondent erred in disallowing certain deductions for the expense of operating an automobile used exclusively for business purposes in 1940 and 1941. 6. Upon the evidence, held, petitioner has failed to prove that the respondent erred in disallowing certain amounts claimed for depreciation of automobiles in 1940, 1941 and 1942. 7. Upon the evidence, held, certain amounts paid by petitioner to his son and daughter in 1941, and certain amounts paid to his daughter in 1942 and 1943 are deductible as representing reasonable compensation paid for services actually rendered and that certain amounts paid to his son in 1940 and 1941 are not so deductible. Held, further, an amount paid in 1941 for a new dictaphone is not deductible in lieu of compensation for stenographic services but represents a capital expenditure returnable through depreciation allowances. 8. Upon the evidence, held, certain stock received by petitioner in 1941 was received as a gift and as such it was not includible in gross income. 9. Certain amounts received by petitioner from the D. H. Willey Lumber Co. during the years 1937 through 1943, held, to be distributions of profits from that company rather than *144 the return to petitioner of his capital investment, if any, in the Big Springs Lumber Co. and are taxable to petitioner as dividends to the extent of the available earnings or profits of the D. H. Willey Lumber Co. Held, further, a certain amount received in 1941 was a gift to petitioner from Willey rather than a distribution of profits from the D. H. Willey Lumber Co. 10. Petitioner had a son who was studying for the priesthood and who was a member of the Jesuit Order. As a member of this Order he had taken a vow of poverty and was obliged immediately to turn over to the Order all property given to him. During 1943, petitioner gave his son at least $250. Held, a gift to the son under these circumstances was a gift to or for the use of the Order and is deductible by petitioner as a contribution under section 23 (o) of the Internal Revenue Code, as amended. 11. Held, that although Ratterman was grossly negligent in the way he reported and failed to report some of the items of his gross income, it is found from all the facts that his income tax returns and the joint return for one year of Ratterman and his wife were not false and fraudulent with intent to evade *145 tax and the fraud penalties determined by the respondent are not sustained. Mitchell v. Commissioner, 118 Fed. (2d) 308. 12. The income tax returns of Ratterman for the years 1937 and 1940 were not false and fraudulent with intent to evade tax. The respondent has conceded that if the Court holds such to be the case that deficiencies against Ratterman for those years are barred by the statute of limitations. Held, that deficiencies determined against Ratterman for the years 1937 and 1940 are barred by the statute of limitations. L. F. Ratterman, C.P.A., pro se. John O. Durkan, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The respondent, in these consolidated proceedings, determined deficiencies in income tax and 50 per cent penalties, as follows: Docket No.
Petitioner
Year
Deficiency
Penalty
11913
L. F. Ratterman
1937
$ 52.36
$ 26.18
11319
L. F. Ratterman and Claribel Ratterman
1938
742.54
371.27
11913
L. F. Ratterman
1939
139.78
69.89
11913
L. F. Ratterman
1940
5,891.41
2,945.71
11913
L. F. Ratterman
1941
3,810.38
1,905.19
12080
L. F. Ratterman
1943
605.29
The deficiencies in taxes are due to numerous adjustments to the net income as reported by petitioners in their returns. Not all of these adjustments are contested. Due to section 6 of *147 the Current Tax Payment Act of 1943, it is necessary also to consider the year 1942 in arriving at the correct tax liability for the year 1943. Petitioners by appropriate assignments of error contest either in whole or in part three types of adjustments made by the respondent for the years 1937 through 1943, as follows: Net income
from business
Year
or profession
Dividends
Contributions
1937
$ 1,061.80
$ 594.41
1938
800.92
7,561.74
1939
1,850.95
1,026.24
1940
20,826.97
1,249.81
1941
10,821.87
1,254.53
1942
1,016.73
615.37
1943
567.72
615.37 $250
The first type of adjustment, namely, net income from business or profession, is the "net" result of several items consisting of both increases and decreases to the net income as originally returned, so that in some instances where petitioners do not contest the decreases the amount actually contested for that particular year is larger than the "net" amount shown in the statement attached to the respective deficiency notice. To illustrate, for 1937 the first adjustment appearing in the statement attached to the deficiency notice is "(a) Net income from business or profession $1,061.80." *148 This is the net result of adjustments made by the respondent to four items, as follows: Increase
Decrease
Item
Returned
Adjusted
to income
to income
(1) Auto-Vehicle Parts Co. $900
$ 900.00
(2) Snook-Veith Lumber Co.
$500.00
550
50.00
(3) Miscellaneous receipts
411.03
$ 411.03
(4) Office and advertising expense
522.83
522.83
Total increases and decreases
$1,472.83
$ 411.03
Less total decreases
411.03
Amount of adjustment (a)
$1,061.80
Ratterman contests items (1) and (4)
$1,422.83
Ratterman concedes items (2) and (3), net decrease
361.03
Amount of adjustment (a)
$1,061.80
The actual amounts of the first type of adjustment thus either conceded or contested for the years 1937 through 1943 are as follows (NOTE: Amounts in parenthesis are decreases to income): Year
Item
Conceded
Contested
1937
Auto-Vehicle Parts Co.
$ 900.00
Snook-Veith Lumber Co.
$ 50.00
Miscellaneous receipts
( 411.03)
Office and advertising expense
522.83
1938
D. H. Willey Lumber Co.
1,200.00
Auto-Vehicle Parts Co.
1,200.00
Frankfort Lbr. & Mfg. Co.
( 250.00)
Miscellaneous receipts
( 160.78)
Additional salaries allowed
( 1,600.00)
Advertising expense disallowed
411.70
1939
Naegele Dry Cleaning Co.
312.50
Advance Millwork Co.
294.15
D. H. Willey Lumber Co.
1,200.00
Auto-Vehicle Parts Co.
1,200.00
Frankfort Lumber & Mfg. Co.
250.00
Estate of C. B. Cahill
100.00
Additional salaries allowed
( 1,800.00)
Advertising expense disallowed
294.30
1940
Naegele Dry Cleaning Co.
625.00
D. H. Willey Lumber Co.
600.00
Auto-Vehicle Parts Co.
1,200.00
Estate of C. B. Cahill
125.00
Layer Estate
13,500.00
Layer Estate
3,999.14
Auto expense disallowed
120.00
Auto depreciation disallowed
103.90
Salaries disallowed
18.00
Advertising and travel expense
535.93
1941
Auto-Vehicle Parts Co.
( 1,200.00)
Estate of C. B. Cahill
100.00
Layer Estate, Trustee fee
638.58
Methanal Producers
555.40
C. J. Rennekamp
7,360.00
Auto expense disallowed
110.00
Auto depreciation disallowed
232.00
Salaries disallowed
2,282.78
Advertising and travel expense
750.38
Dictaphone depreciation allowed
( 7.27)
1942
Salary paid to daughter
200.00
Auto depreciation disallowed
232.00
Advertising expense disallowed
584.73
1943
Salary paid to daughter
225.00
Advertising expense disallowed
342.72
*149 The remaining two types of adjustments are either conceded or contested in amounts as follows (NOTE: Amount in parenthesis indicates excess dividends reported): Dividends
Contributions
Year
Conceded
Contested
All contested
1937
$79.54
$ 514.87
1938
62.80
7,498.94
1939
44.20
982.04
1940
19.05
1,230.76
1941
( 10.85)
1,265.38
1942
615.37
1943
615.37 $250
L. F. Ratterman alleges that the assessment and collection of any deficiency in tax against him for the years 1937 and 1940 are barred by the statute of limitations. The respondent affirmatively alleges that the returns as filed by L. F. Ratterman for the years 1937, 1939, 1940 and 1941 and the joint return as filed by L. F. Ratterman and Claribel Ratterman for the year 1938 were false and fraudulent returns with intent to evade tax and that each of the deficiencies in tax for such years was due, in whole or in part, to fraud with intent to evade tax. The issues thus raised are summarized as follows: 1. Did the respondent err in including in L. F. Ratterman's gross income for the years 1937, 1938, 1939 and 1940 certain amounts as representing income received from the Auto-Vehicle *150 Parts Co. and the D. H. Willey Lumber Co.? 2. Did the respondent err in disallowing certain amounts claimed on the returns as either office, advertising or travel expenses for the years 1937 through 1943? 3. Did the respondent err in determining that $13,500 received by Ratterman in 1940 was taxable income to him rather than a gift or gifts? 4. Did the respondent err in determining that $3,999.14 received by Ratterman in 1940 was taxable income to him rather than a gift or in part repayment of advances? 5. Did the respondent err in disallowing certain automobile expenses in 1940 and 1941? 6. Did the respondent err in disallowing certain amounts claimed for depreciation of automobiles in 1940, 1941 and 1942? 7. Did the respondent err in disallowing certain amounts claimed as salaries paid to others for the years 1940, 1941, 1942 and 1943? 8. Did the respondent err in determining that Ratterman received income in 1941 from one C. J. Rennekamp in the amount of $7,360 rather than a gift? 9. Did the respondent err in determining that certain distributions received by Ratterman from the D. H. Willey Lumber Co. in 1937 through 1943 constitute taxable dividends? 10. Did *151 the respondent err in disallowing a part of the amount claimed by Ratterman in 1943 as contributions? 11. Did the respondent err in asserting fraud penalties against Ratterman for the years 1937, 1939, 1940 and 1941, and against Ratterman and his wife for the year 1938? 12. Is the assessment or collection of any deficiency against Ratterman for the years 1937 and 1940 barred by the statute of limitations? The respondent concedes that these years are barred unless fraud is proven. It was agreed at the hearing that the evidence introduced in Docket numbers 10864, 11911, 11912 and 12597 (the D. H. Willey Lumber Co. and D. H. Willey cases for 1936 through 1943) as far as it is material they may also be considered as evidence in the instant proceedings. It has been so considered in making our findings of fact. Findings of Fact In General. Petitioners are husband and wife, residing in Cincinnati, Ohio. Petitioner L. F. Ratterman is sometimes referred to as "Ratterman." The returns in question were all filed with the collector for the first district of Ohio in Cincinnati. Petitioners filed a joint return for the year 1938. Ratterman filed separate returns for the years 1937 and *152 1939 through 1943. Claribel Ratterman is a petitioner only for the year 1938. Issue 1. The respondent determined that during the years 1937, 1938, 1939 and 1940 Ratterman received taxable income from the Auto-Vehicle Parts Co. in the amounts of $900, $1,200, $1,200 and $1,200, respectively. Ratterman failed to report these amounts as income. The respondent also determined that during the years 1938, 1939 and 1940 Ratterman received taxable income from the D. H. Willey Lumber Co. (exclusive of the distributions involved in Issue 9) in the amounts of $1,200, $1,200 and $600, respectively. Ratterman failed to report these amounts as income. For each of the years 1938, 1939 and 1940 the D. H. Willey Lumber Co. deducted $1,200 as compensation paid to Ratterman as an officer of the Co. For the years 1938 and 1939 the respondent allowed Ratterman to deduct as salaries paid, $1,600 and $1,800, respectively, in addition to the amounts claimed on the returns, and for 1941 the respondent determined that Ratterman had reported excessive income from the Auto-Vehicle Parts Co. in the amount of $1,200. Issue 2. As shown in the statements attached to the deficiency notices here involved, the *153 respondent increased the net income as reported on the returns by disallowing certain deductions claimed on the returns, as follows: Year
Deduction disallowed
Amount
1937
Office and advertising expense
$522.83
1938
Advertising expense
411.70
1939
Advertising expense
294.30
1940
Advertising and travel expense
535.93
1941
Advertising and travel expense
750.38
1942
Advertising expense
584.73
1943
Advertising expense
342.72
On the return for 1937, under "Other Business Deductions" Ratterman deducted $522.83 for office and advertising expenses. The deduction was disallowed by the respondent with no specific reason given except that "It is held that your net income from business or profession was $5,557.52, in lieu of $4,495.72 as reported, in accordance with the provisions of sections 22 and/or 23 of the Revenue Act of 1936." During 1937, Ratterman made three business trips to Cleveland at a cost of at least $75 for each trip. During the years 1937 through 1940 Ratterman belonged to the Cincinnati Club. One of the firms in which Ratterman was interested did all of the dry cleaning for the Club. His expenses at the club during these years (1937 *154 through 1940) have never been less than $300 a year. Ratterman has never been reimbursed and has never received any deduction from his gross income for any of these traveling or club expenses. On the return for 1938, under "Other Business Deductions" Ratterman deducted $411.70 for advertising. The deduction was disallowed by the respondent for no more of a reason than that given for 1937. During 1938, Ratterman attended three lumbermen's conventions at Columbus, Indianapolis, and Louisville upon three different occasions at a cost of at least $75 for each trip. During 1938, his expenses at the Cincinnati Club were at least $300. Ratterman has never been reimbursed and has never received any deduction from his gross income for any of these traveling or club expenses. On the return for 1939, under "Other Business Deductions" Ratterman deducted $294.30 for advertising and $114.38 for traveling expenses. The deduction for advertising was disallowed by the respondent for no more of a reason than that given for 1937. The respondent allowed the $114.38 for traveling expenses. During 1939 Ratterman attended the same three conventions he had attended the previous year and his expenses *155 at the Cincinnati Club were at least $300. Ratterman has never been reimbursed and has never received any deduction from his gross income for any of these club expenses. On the return for 1940, under "Other Business Deductions" Ratterman deducted $685.93 for advertising and traveling expenses. Of this deduction $150 was allowed by the respondent and $535.93 was disallowed for no more of a reason than that given for 1937. During 1940 Ratterman attended the same three lumbermen's conventions he had attended for the two previous years at a cost of at least $75 for each trip. He also made two business trips to Grand Rapids, Michigan in connection with his position of trustee of the Layer estate. These trips cost Ratterman at least $75 a trip. During 1940 his expenses at the Cincinnati Club were at least $300. Ratterman has never been reimbursed and has never received any deduction from his gross income for any of these traveling or club expenses in excess of the $150 allowed by the respondent. No evidence has ebeen offered to show error on the part of the respondent relative to the disallowance of the deduction claimed on the return for the year 1941 for advertising and travel expense, *156 or relative to the disallowance of the deductions claimed on the returns for the years 1942 and 1943 for advertising expense. Issue 3. As shown in the statement attached to the deficiency notice in Docket 11913 the respondent increased the net income as reported for the year 1940 by an adjustment labeled "(a) Net income from business or profession $20,826.97" which he explained as follows: "(a) It is held that your net income from business or profession was $29,777.24, in lieu of $8,950.27 as reported, in accordance with the provisions of sections 22 and/or 23 of the Internal Revenue Code. "Computation
Understatement of gross receipts
$20,049.14
Business deductions disallowed: Salaries
$ 18.00
Advertising and travel ex-
pense
535.93
Auto expense
120.00
Auto depreciation
103.90
777.83
Increase to net income of business
or profession
$20,826.97"
As shown in our opening statement the above-mentioned understatement of gross receipts of $20,049.14 is the aggregate of the following items: Naegele Dry Cleaning Co.
$ 625.00
D. H. Willey Lumber Co.
600.00
Auto-Vehicle Parts Co.
1,200.00
Estate of C. B. Cahill
125.00
Layer Estate
13,500.00
Layer Estate
3,999.14
Total understatement
$20,049.14
*157 Issue 3 involves the above item of $13,500. William G. Layer, husband of Catherine V. Layer, died testate on January 2, 1939. His will was filed for probate with the Probate Court of Hamilton County, Ohio. The Fifty-Third Union Trust Company and L. F. Ratterman were the duly appointed executors and trustees of the estate. Prior to his death Layer had over $100,000 on deposit in a bank. He became ill and could not write checks. He then changed his account into a joint survivorship account with his wife so that she could write checks. Just before Layer died his wife drew out all the money and deposited it in her own account. Layer in his will had made certain dispositions of this money but before the executors and trustees of his estate could make these dispositions they had to recover the money from the widow. The executors and trustees then employed the firm of Ratterman, Cowell and Fletcher as their attorneys in the matter. At that time the members of this firm were Fred Ratterman (son of petitioner), John W. Cowell and Stuart E. Fletcher. Petitioner had previously been a member of the firm. On January 27, 1940, the widow and the executors and trustees entered into an "Agreement *158 of Settlement," the material provisions of which are as follows: "WHEREAS, William G. Layer, husband of Catherine V. Layer, died January 2, 1939 and at the time of his death there was One Hundred Thousand Ninety-three & 79/100 ($100,093.79) Dollars in The Fifth-Third Union Trust Company in the name of Catherine V. Layer, which amount is claimed by Catherine V. Layer as her individual property and is also claimed by the Executors and Trustees of the estate of William G. Layer as part of the estate; and "WHEREAS, both parties are desirous of settling their differences amicably, IT IS THEREFORE, AGREED AS FOLLOWS: "First: The estate of William G. Layer is to have Sixty Thousand ($60,000.00) Dollars out of said bank account, a check for said amount to be issued to The Fifth-Third Union Trust Company and L. F. Ratterman, as Executors and Trustees of the estate of William G. Layer by Catherine V. Layer. "Second: Catherine V. Layer agrees to give a receipt to the Executors for Fifty-five Hundred ($5500.00) Dollars being the amount of her first year's allowance and property set aside to her as exempt, to which sum she waives any and all claim. Said sum is to remain in and be part of *159 the estate of the said William G. Layer. "Third: Catherine V. Layer does hereby release the Fifth-Third Union Trust Company and L. F. Ratterman, individually and as Executors and Trustees of the estate of William G. Layer from any and all claims that she has or may have by reason of the withholding of the money in said bank account as part of the estate of William G. Layer. * * *
"Sixth: Catherine V. Layer hereby waives any and all objection she has or may have against The Cincinnati Sash & Door Company paying and having paid to Virginia Carlberg the sum of One Hundred ($100.00) Dollars per month. "Seventh: Catherine V. Layer hereby consents to the immediate payment of the legacy to Anna B. Rockwell of Ten ($10.00) Dollars per week out of the income from said estate." "The Executors of the estate of William G. Layer agree to the following: "First: They hereby waive any claims which they have or may have in the balance of Forty Thousand Ninety-three & 79/100 ($40,093.79) Dollars on deposit in the name of Catherine V. Layer in The Fifth-Third Union Trust Company. "Second: They agree to pay to Catherine V. Layer the net income earned by said estate to December 31, 1939, which *160 said net income will be $20,347.82 less taxes, proper deductions and expenses as follows: "Income taxes
$1,616.95
Ohio Intangible Tax
1,017.89
Trustees' Commissions
1,017.89
Less annuity due Anna B.
Rockwell amounting to as
of December 31, 1939
520.00
Less the following debts
against the estate to-wit: Claim of John W. Cowell
6,250.00
Claim of Stuart E. Fletcher
210.00
Less miscellaneous items
1,020.00
$11,652.73
To be paid to Catherine V. Layer
$ 8,695.09
"It is further agreed that any portion of the Sixty Thousand ($60,000.00) Dollars received from the Fifth-Third Union Trust Company bank account that is not needed to pay taxes, legacies and debts and expenses of the estate will be paid to Catherine V. Layer." At the time Layer died he had property other than the disputed bank balance of approximately $150,000. The firm of Ratterman, Cowell and Fletcher also performed services in connection with administering this part of the estate as well as in connection with obtaining the $60,000 compromise settlement with the widow. On May 31, 1940, the probate court entered an order relative to the estate of William G. Layer, deceased, the body *161 of which is as follows: "This cause coming on to be heard on the application of L. F. Ratterman and The Fifth-Third Union Trust Company, Co-Executors and Co-Trustees of the estate of William G. Layer, deceased, to fix the amount to be paid to them for their services as Co-Executors and for the services of their attorneys, the firm of Ratterman, Cowell and Fletcher. "The Court being fully advised in the premises now orders said Co-Executors and Co-Trustees to pay to themselves for their ordinary and extraordinary services as Co-Executors the sum of $10,000.00 and to pay to the firm of Ratterman, Cowell and Fletcher for the reasonable value of their services as attorneys the sum of $20,000.00." The above-mentioned sums of $10,000 and $20,000 were paid during 1940. Ratterman duly returned his share of the $10,000 fee and no part of that fee is here involved. The $20,000 fee was originally divided between the members of the firm as follows: Fred Ratterman
$8,500
Fletcher
8,000
Cowell
3,500
At the time this division was agreed upon by the members of the firm Fred Ratterman suggested that some part of the fee be turned over to his father, L. F. Ratterman. The *162 other two members of the firm agreed with Fred that this should be done. Fred then mentioned to his father that the members of the firm were contemplating making "gifts" to him of a part of the $20,000 fee, whereupon L. F. Ratterman said he would consent to accept such "gifts" only if they returned the amounts as their income and then permit him to reimburse them for the additional income tax they would have to pay by reason of including in their income the amounts which they would turn over to L. F. Ratterman. As a result of these discussions Fred turned over to his father $4,500 and retained $4,000; Fletcher turned over $7,500 and retained $500; and Cowell turned over $1,500 and retained $2,000. Neither Fred, Fletcher nor Cowell filed any gift tax returns reporting any gifts to L. F. Ratterman. There would have been no tax even if they had done so. Fred reported as a part of his income $8,500; Fletcher $8,000, and Cowell $3,500. L. F. Ratterman did not report any part of the $13,500 received by him from Fred, Fletcher and Cowell. The actual tax liabilities reported by the above four persons for 1940, what such reported tax liabilities would have been if L. F. Ratterman would have *163 reported the $13,500 (and the $3,999.14 to be considered later in this report as Issue 4) as his income instead of such amounts being reported by Fred, Fletcher and Cowell, and the difference between the two liabilities, are as follows: Actual tax liability
What it would
Name of taxpayer
reported
have been
Difference
L. F. Ratterman
$ 550.40
$4,748.66
$4,198.26
Fred Ratterman
483.33
110.85
(372.48)
Fletcher
622.80
39.20
(583.60)
Cowell
609.68
114.37
(495.31)
$2,266.21
$5,013.08
$2,746.87
On March 1, 1941, L. F. Ratterman paid directly to the collector the first installment of the above-mentioned tax liability for 1940 as reported by Fred Ratterman, Fletcher and Cowell. On June 1, 1941, he reimbursed Fletcher and Cowell for the amount of their second installment. On September 1, 1941, he reimbursed Fletcher and Cowell for the amount of their third installment. On December 29, 1941, he reimbursed Fletcher to the extent of $117.60 and Cowell to the extent of $38.05 of their final installment of taxes reported for 1940. The sum of these payments is in amounts as follows: Date
Fred Ratterman
Fletcher
Cowell
March 1, 1941
$120.84
$155.70
$152.42
June 1, 1941
155.70
152.42
Sept. 1, 1941
155.70
152.42
Dec. 29, 1941
117.60
38.05
Totals
$120.84
$584.70
$495.31
*164 Prior to the agreement of settlement entered into on January 27, 1940, the firm of Ratterman, Cowell and Fletcher had recommended to settle with the widow of Layer for $50,000, but L. F. Ratterman refused to permit such a settlement to be had and as a result of his activities a much more favorable settlement for the estate was obtained by the agreement of January 27, 1940. In this connection L. F. Ratterman wrote to four agents of the Bureau of Internal Revenue on October 19, 1942, in part, as follows: "You asked Mr. Cowell how they happened to get the $20,000.00 fee in the Layer Estate, and if I wasn't responsible for getting that case settled, and for that reason I want to submit a statement of the facts, relating what happened in the week ending on Saturday, January 27th, 1940. * * *
"At 2 P.M., on SATURDAY, all were present, except the widow, and I advised all concerned that the $50,000.00 offer of settlement made, the acceptance of which by the Executors was recommended by their attorneys, was rejected. Thereafter, for almost two hours I believe I did most of the talking, and at the end of that time an agreement of settlement was prepared, for submission to the widow, *165 and the widow's nephew and attorney left the meeting with the agreement, to obtain, if possible, the widow's signature. They returned about half an hour later with the agreement signed by the widow, which is hereto attached, marked Exhibit 'C', and made a part hereof. "Therefore is it not foolish to ask whether I 'wasn't responsible for getting that case settled', and to expect any other answer than 'Yes,' when all had agreed to accept $50,000.00, and I alone obtained, whereby we received what to a recent date amounts to $81,818.18, as follows: "Page 1, Paragraph 'First', Check from Catherine V. Layer
$60,000.00
Page 1, Paragraph 'Second', Receipt from Catherine V. Layer
5,500.00
Page 2, Paragraph 'Third', Waiver of Income due
11,652.75
Page 2, Paragraph 'Seventh', Anna B. Rockwell, to Oct. 1, 1942
2,365.43
Page 2, Paragraph 'Sixth', Virginia Carlberg, to Oct. 1, 1942, (half)
2,300.00
TOTAL RECEIVED, Under Exhibit 'C'
$81,818.18 and, it was this increase of $31,818.18, which caused the Judge to allow the Executors and their attorneys, $10,000.00 and $20,000.00, respectively, upon hearing and considering all of the facts, as herein related, instead of allowing *166 $5,000.00 to the Executors, and a similar amount to their Attorneys, on the 31st day of May, 1940." On June 26, 1942, L. F. Ratterman addressed a letter to Cowell, Fletcher and Fred Ratterman regarding the $20,000 fee in which letter, among other things, he said: "In a case of this kind I believe the Judge would have allowed an ordinary fee of about $5,000.00, and the additional $15,000.00 was allowed in this case because of the recovery of $60,000.00 additional for the estate, the accomplishing of which was perhaps for a large part through my own activities. However, in such cases a trustee must act through his attorneys, named by the Court, and even if he did all of the work the attorneys named get the fee, and it is not for us to criticise the Court. * * *" The payments to Ratterman by his son, Fred, and Fletcher and Cowell were not gifts to him. They were in effect an unethical division of fees on the part of the law firm with Ratterman, one of the trustees of the estate. Issue 4. This issue involves the item "Layer Estate $3,999.14" mentioned under the previous issue as a part of the $20,049.14 understatement of gross receipts determined by the respondent. Cowell individually *167 had performed certain services for Layer during the latter's lifetime. Upon his death Cowell filed a claim against the Layer estate for payment of such services in the amount of $7,500. The claim was rejected by the executors and trustees of the estate. Arbitrators were appointed and the arbitrators allowed Cowell a fee of $6,250. On July 7, 1939, the Probate Court of Hamilton County, Ohio, in the matter of the Estate of William G. Layer entered an order confirming the report of the referees and fixing fees, the material part of which is as follows: "It is therefore, ordered that the Fifth-Third Union Trust Company and L. F. Ratterman, as Executors of the Estate of William G. Layer, deceased, pay to John W. Cowell, the sum of Six Thousand Two Hundred and Fifty ($6,250,000) Dollars, as heretofore found due him by the report of said Referees and that they pay to each of said Referees, Edwin S. Morrissey, Charles Tatgenhorst and Charles H. Stephens, Jr., the sum of $75.00 each in full of their fees in said matter." The executors and trustees of the Layer estate paid the $6,250 to Cowell during the year 1939 out of the income of the estate for that year. (See the January 27, 1940 agreement *168 of settlement set out in part under Issue 3 above.) Between May 1 and June 29, 1939, L. F. Ratterman paid $1,198.29 for new fturniture and fixtures for the office occupied by himself, Cowell and Fletcher. At some time prior to 1940 he also advanced $750 in cash to Cowell. He and Cowell had been associated together from about the time they graduated from law school. After Cowell received the $6,250 check from the Layer estate he told L. F. Ratterman he wanted to reimburse him for the cost of the office furniture and fixtures and advances totaling $1,948.29 and to make Ratterman an outright gift of approximately one-half of the remainder of the fee. In accordance with this statement Cowell sometime in 1940 paid over to L. F. Ratterman the amount of $3,999.14. Cowell returned the $6,250 fee which he had received as his own income in his 1939 return. He did not file any gift tax return relative to the amount turned over to Ratterman and Ratterman did not report any part of the $3,999.14 as income in his 1940 income tax return. Of the payment in question, $2,050.85 was a gift from Cowell to Ratterman. Issue 5. On his return for 1940 under "Other Business Deductions" Ratterman deducted *169 $360 for "Auto Maintenance and Gasoline 18,000 miles at 2 cents per mile." The respondent disallowed $120 of the deduction claimed but did not disturb the balance of $240. He stated on his return "Have a separate sedan for family use." On his return for 1941 under "Other Business Deductions" Ratterman deducted $330 for "Auto Maint & Gasoline 11,000 miles at 3 cents." The respondent disallowed $110 of the deduction claimed but did not disturb the balance of $220. He stated on his return "Have separate sedan for family (wife and son)." Ratterman used his automobile for business purposes to the extent of at least 15,000 miles during 1940 and 1941. His expenses in such use amounted to at least $360 in 1940 and $330 in 1941. Issue 6. In his return for the year 1940, Ratterman claimed a deduction for the depreciation of a 1939 automobile used exclusively in his business of $311.35. The respondent disallowed $103.90 of the deduction claimed and allowed the balance of $207.45. In his returns for the years 1941 and 1942, Ratterman claimed deductions for the depreciation of a 1941 Lincoln Zephyr coupe used exclusively in his business of $580 for each year. The respondent disallowed $232 *170 of the deduction claimed for each year and allowed the balance of $348 for each year. Issue 7. On his returns for 1940, 1941, 1942 and 1943, under "Other Business Deductions" Ratterman deducted certain amounts for salaries and wages paid to others. The amounts so deducted and the amounts allowed and disallowed by the respondent are as follows: Year
Deducted
Allowed
Disallowed
1940
$1,918.00
$1,900.00
$ 18.00
1941
2,898.78
616.00
2,282.78
1942
1,295.00
1,095.00
200.00
1943
1,130.00
905.00
225.00
The amount of $18 disallowed in 1940 was paid to petitioner's son, Fred Ratterman, together with $700. The respondent allowed petitioner to deduct the $700 but did not allow the $18. No specific reason for the disallowance was given in the statement attached to the deficiency notice. The amount of $2,282.78 disallowed in 1941 is made up of three items, namely, $500 paid to petitioner's daughter, Claribel Ratterman Katzenberg, in 1941 for services actually rendered, $910 paid to petitioner's son, Fred, for services actually rendered and partly as a bonus during January and until February 3, 1941, which was up to the time he joined the Federal Bureau *171 of Investigation, and $872.78 for a new dictaphone which petitioner bought on or about November 24, 1941 due to the shortage of stenographic help in the office. The $500 paid to Claribel was for special services rendered as an attorney during April, August, September and December of 1941 in reviewing reports and briefs. Fred is a lawyer and an accountant. He also has an A.B. degree from the University of Michigan and was an assistant to his father until February 3, 1941. The respondent did not allow petitioner any deduction in 1941 for the above amounts paid to his daughter and son. The $500 paid to Claribel and $410 of the $910 paid to Fred are deductible by petitioner as representing reasonable compensation paid for services actually rendered for petitioner in carrying on his profession during the year 1941. The amount deducted for the dictaphone was properly disallowed by the respondent as representing a capital expenditure returnable through deductions for depreciation. The amount of $200 disallowed in 1942 was paid to Claribel for special services rendered as an attorney during March, June and September of 1942 in reviewing reports and briefs. The amounts is deductible by petitioner *172 as representing reasonable compensation paid for services actually rendered for petitioner in carrying on his profession during the year 1942. The amount of $225 disallowed in 1943 was paid to Claribel for special services rendered in 1943 similar to those rendered in 1942. The amount is deductible by petitioner as representing reasonable compensation paid for services rendered for petitioner in carrying on his profession during the year 1943. Issue 8. As shown in the statement attached to the deficiency notice in Docket 11913, the respondent increased the net income as reported for the year 1941 by an adjustment labeled "(a) Net income from business or profession $10,821.87" which he explained as follows: "(a) It is held that your net income from business or profession was $18,268.86, in lieu of $7,446.99 as reported, in accordance with the provisions of sections 22 and/or 23 of the Internal Revenue Code. "Computation
Understatement of gross receipts
$ 7,453.98
Business deductions disallowed: Salaries
$2,282.78
Advertising and travel ex-
pense
750.38
Auto expense
110.00
Auto depreciation
232.00
3,375.16
Total
$10,829.14
Less: Additional depreciation
allowed
7.27
Increase to net income of business
or profession
$10,821.87"
*173 As shown in our opening statement the above-mentioned understatement of gross receipts of $7,453.98 is the net aggregate of the following items: Estate of C. B. Cahill
$ 100.00
Layer Estate, Trustee fee
638.58
Methanal Producers
555.40
C. J. Rennekamp
7,360.00
Total
$8,653.98
Less Overstatement of income from
Auto-Vehicle Parts Co.
1,200.00
Understatement of gross receipts
$7,453.98
Issue 8 involves the above item of C. J. Rennekamp, $7,360. During the year 1941 Ratterman received from C. J. Rennekamp about 800 shares of stock in the Auto-Vehicle Parts Co. Ratterman and Rennekamp had been associates together in business since the beginning of that company. At one time Ratterman was president of the company and after Rennekamp's death he again became president of the company until Rennekamp's widow sold the stock Rennekamp owned in the company at his death. The above-mentioned 800 shares had been issued to Ratterman and were in his name for some time prior to the year 1941. The shares had been endorsed in blank and were in Rennekamp's possession. About January, 1941 Rennekamp told Ratterman that he wanted to turn over to Ratterman as a gift the said *174 800 shares of stock which had been in Ratterman's name for the past several years. Rennekamp then turned the shares over to Ratterman as a gift. Rennekamp was not indebted to Ratterman for anything at the time and Ratterman accepted these shares as a gift from Rennekamp. Ratterman did not return the stock as income in 1941 for the reason that he regarded it as a gift. The respondent determined that the stock had a fair market value in 1941 of $7,360 and that this amount represented income to Ratterman. We find as an ultimate fact that the receipt of the stock by Ratterman was a gift to him from Rennekamp. Issue 9. 1. The D. H. Willey Lumber Company (hereinafter sometimes referred to as "the Co.") is an Ohio corporation which, during the taxable years 1936 through 1943, was doing business in Cincinnati, Ohio. It was incorporated in January, 1924. 2. During the taxable years 1936 through 1943, D. H. Willey was president and L. F. Ratterman was vice president and secretary of the Co. 3. The outstanding common stock of the Co., par value $100, was owned as follows: D. H.
L. F.
Henry E.
Henry
Edward H.
Year
Willey
Ratterman
Betz
Geist
Geist
shares
shares
shares
shares
shares
1936
780
55
15
1937
780
55
15
1938
855 [1]
130 [1]
15
1939
855
130
15
1940
855
130
15 [2]
1941
805
130
50 [3]
15
1942
805
130
50
15
1943
805
130
50
15
*175 4. The income and declared value excess profits tax returns of the Co. for the taxable years 1936 through 1943 were prepared under the direction of Ratterman. He also kept the books of the Co. and all entries therein were either made by him or under his personal supervision. The books were kept upon the accrual basis. Ratterman is about 62 years of age, an attorney and certified public accountant duly licensed to practice in Ohio, a former member of the Ohio State Board of Accountancy and an officer of several corporations located in Cincinnati. 5. Ratterman and Willey have been business associates since 1924. As officers, both signed the income and declared value excess profits tax return filed by the Co. for the taxable years 1936 through 1943. 6. The sales of the Co. for the taxable year 1936 as shown by its books of account totaled $138,032.48, while the income and declared value excess profits tax return filed by the Co. for that year reported only $126,636.51 *176 or an understatement of $11,395.97. 7. The books of the Co. show total purchases of $88,352.01 for the taxable year 1936 while the income and declared value excess profits tax return filed by the Co. for that year reported $92,059.56 or an overstatement of $3,707.55. 8. The books of the Co. show discounts earned of $1,292.45 for the taxable year 1936, while the income and declared value excess profits tax return filed by the Co. for that year failed to include this amount in income. 9. The books of the Co. show bad debt recoveries of $604.03 for the taxable year 1936, while the income and declared value excess profits tax return filed by the Co. for that year failed to include this amount in income. 10. The Co. erroneously understated its income in the amount of $17,000 as described in paragraphs 6 to 9, inclusive, supra, by charging its profit and loss account in the general ledger with that amount, the credit being to accounts payable. The charge to profit and loss was described as "Big Springs." In this manner the net income as shown by the Company's profit and loss statement agreed with that reported on its tax returns. 11. In the taxable year 1937 the erroneous credit *177 of $17,000 to accounts payable referred to in paragraph 10, supra, was eliminated by distributions to stockholders of the Co. in proportion to their holdings of stock as follows: Number of
Distri-
Amount re-
shares held
butions
ceived per
in the Co.
received
share held
D. H. Willey
780
$15,600 $20
L. F. Ratterman
55
1,100
20
Henry Geist
15
300
20
Total
850
$17,000
12. On October 31, 1938, $4,533.67 was charged to purchases of lumber from the Big Springs Lumber Co. in the accounts payable journal of the Co., the credit being to accounts payable. This entry did not represent an actual purchase of lumber. On November 30, 1938, the Co. drew a check for $4,533.67 to Fred Ratterman, care of Big Springs Lumber Co. This check was charged to accounts payable. Fred, in accordance with the directions of his father, L. F. Ratterman, distributed this amount pro rata to the stockholders of the Co. as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
780
$4,160.32
$5,33374
L. F. Ratterman
55
293.35
5.33374
Henry Geist
15
80.00
5.33374
850
$4,533.67
13. During November, 1938, *178 $3,967.33 was charged to purchases of lumber from the Big Springs Lumber Co. and credited to accounts payable on the Company's books. On December 21, 1938, similar entry for $566.34 was made. Neither of these entries represented actual purchases of lumber. On December 31, 1938, a check for $4,533.67 was issued by the Co. to Fred Ratterman, care of Big Springs Lumber Co.Fred distributed this amount to the stockholders of the Co. on the basis of the stockholdings prior to the receipt by Willey and Ratterman of the 150 shares of treasury stock mentioned in paragraph 3, supra, as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
780
$4,160.32
$5.33374
L. F. Ratterman
55
293.35
5.33374
Henry Geist
15
80.00
5.33374
850
$4,533.67
14. Sales by the Co. of lumber, building materials and millwork for October, 1938, were understated in posting from the journal to the ledger by the respective amounts of $1,000, $1,000 and $3,000 or a total understatement of sales of $5,000. Likewise, the ledger postings for these accounts for the following months of November and December of 1938 were also understated. The total understatement *179 of sales for these three months was $15,000. For each of these months a credit of $5,000 was entered in an account titled "Commissions due officers." This was an erroneous account for neither officer of the Co. was entitled to commissions. The total credit of $15,000 thus entered to this account balanced the understatement of sales for the same period. In 1930 purchases by the Co. of its stock in the total amount of $15,000 was entered in its treasury stock account. Both the "Commissions due officers" and "Treasury stock" accounts are still open on the books of the Co. and each carries the $15,000 balance resulting from the entries described above. The income tax return of the Co. for 1938 included $15,000 of treasury stock as an asset in the balance sheet at the beginning of the taxable year but nothing for treasury stock in the balance sheet (Schedule M) at the end of the taxable year. On December 20, 1938, the Co. transferred without consideration half of its $15,000 worth of treasury stock to Ratterman and half to Willey. The net effect of these entries was to set up an erroneous liability to the officers of the Co. at the expense of sales and to satisfy that alleged liability *180 by issuing treasury stock worth $15,000. 15. On July 29, 1939, $2,266.83 was charged to purchases of lumber from the Big Springs Lumber Co. and credited to accounts payable on the books of the Co. On August 29, 1939, $2,466.84 was charged to mill purchases and credited to accounts payable on the books of the Co. Neither of these amounts represented actual purchases. On July 29 and September 30, 1939, the Co. issued checks to Fred Ratterman, as trustee of the Big Springs Lumber Co., in the respective amounts of $2,266.83 and $2,466.84. Fred distributed this total amount of $4,733.67 pro rata to the stockholders of the Co. as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
855
$4,047.29
$4.73367
L. F. Ratterman
130
615.38
4.73367
Henry Geist
15
71.00
4.73367
1,000
$4,733.67
16. During October, 1939, $4,333.67 was charged to purchases of lumber from the Big Springs Lumber Co. and credited to accounts payable on the books of the Co. This entry did not represent an actual purchase of lumber. On October 28, 1939, the Co. issued a check to Fred Ratterman, as trustee of the Big Springs Lumber Co., in the amount of $4,333.67. *181 This was charged to accounts payable. Fred distributed this amount of $4,333.67 pro rata to the stockholders of the Co. as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
855
$3,705.29
$4.33367
L. F. Ratterman
130
563.38
4.33367
Henry Geist
15
65.00
4.33367
1,000
$4,333.67
17. On July 12, 1940, $2,366.83 and $2,366.84 were charged to purchases of lumber and millwork, respectively, from the Big Springs Lumber Co. on the books of the Co. The credit in each instance was to accounts payable. Neither of these entries represented actual purchases. On July 12, 1940, the Co. issued a check to Fred Ratterman, as trustee of the Big Springs Lumber Co., in the amount of $4,733.67. Fred then distributed this $4,733.67 pro rata to the stockholders of the Co. as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
855
$4,047.29
$4.73367
L. F. Ratterman
130
615.38
4.73367
Edward Geist
15
71.00
4.73367
1,000
$4,733.67
18. Fred Ratterman was a member of the law firm of Ratterman, Cowell and Fletcher. He never was a trustee for the Big Spring Lumber Co., never performed *182 any services for that company, and the foregoing distributions by him to the stockholders of the D. H. Willey Lumber Co. were made as his father, L. R. Ratterman, directed. 19. On November 9 and 22, 1940, $2,766.83 and $1,966.84 were charged to purchases of lumber and millwork, respectively, from the Big Springs Lumber Co. and credited to accounts payable on the books of the Co. Neither of these entries represented actual purchases. On November 23 and December 4, 1940, checks for $2,766.83 and $1,966.84, respectively, were issued by the Co. to Stuart E. Fletcher, as attorney for the Big Springs Lumber Co. and charged to accounts payable. On December 18, 1940, Fletcher distributed the $4,733.67 so received pro rata to the stockholders of the Co. as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
855
$4,047.29
$4.73367
L. F. Ratterman
130
615.38
4.73367
Edward H. Geist
15
71.00
4.73367
1,000
$4,733.67
20. On December 20, 1941, $4,733.67 was charged to purchase of lumber from the Big Springs Lumber Co. and credited to accounts payable on the books of the Co. This did not represent an actual purchase. On December 30, 1941, the *183 Co. issued a check in the amount of $4,733.67 to Fletcher, as attorney for the Big Springs Lumber Co. Fletcher then distributed the amount so received to the stockholders of the Co. pro rata, as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
805
$3,810.60
$4.73367
L. F. Ratterman
130
615.38
4.73367
Edward H. Geist
15
71.01
4.73367
Henry E. Betz
50
236.68
4.73367
1,000
$4,733.67
21. Fletcher was a member of the law firm of Ratterman, Cowell and Fletcher. He never was an attorney for the Big Springs Lumber Co. and made the foregoing distributions to the stockholders of the D. H. Willey Lumber Co. at the request of Ratterman. 22. On December 29, 1942, $4,733.73 was charged to purchases of lumber from the Big Springs Lumber Co. and credited to accounts payable on the books of the Co. This entry did not represent an actual purchase of lumber. On its return the Co. deducted this amount as "Rent." On December 29, 1942, a check for $4,733.73 was issued by the Co. to Ratterman and charged to accounts payable. Ratterman deposited this check and caused cashier's checks to be drawn pro rata to the stockholders of the *184 Co. He retained the undistributed balance of the $4,733.73. The amounts so distributed and retained were as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
805
$3,810.67
$4.73373
L. F. Ratterman
(retained)
130
615.37
4.73373
Henry E. Betz
50
236.68
4.73373
Edward H. Geist
15
71.01
4.73373
1,000
$4,733.73
23. On December 28, 1943, $4,733.73 was charged to purchases of lumber from the Big Springs Lumber Co. and credited to accounts payable on the books of the Co. This entry did not represent an actual purchase of lumber. On its return the Co. deducted this amount as "Rent." On December 28, 1943, the Co. issued Ratterman a check for $4,733.73 which was charged to accounts payable. This check was deposited by Ratterman who caused a cashier's check to be issued to Willey in the amount of $4,118.36, the remaining amount of $615.37 being retained by Ratterman. The amounts so distributed and retained are as follows: Shares
Amount
Amount
held
received
per share
D. H. Willey
805
$4,118.36
$4.73373 -
(Included
share of
Betz
and Ed-
ward H.
Geist
who
were not
paid.)
L. F. Ratterman
(retained)
130
615.37
$4.73373
$4,733.73
*185 24. Ratterman and Willey received but did not report as taxable income the following distributions of cash and treasury stock from the Co. (above described in paragraphs 6 through 23): Edward
Year
Willey
Ratterman
Henry Geist
H. Geist
Betz
Total
1937
$15,600.00
$1,100.00 $300
$17,000.00
1938
15,820.64
8,086.70
160
24,067.34
1939
7,752.58
1,178.76
136
9,067.34
1940
8,094.58
1,230.76
$142.00
9,467.34
1941
3,810.60
615.38
71.01
$236.68
4,733.67
1942
3,810.67
615.37
71.01
236.68
4,733.73
1943
4,188.36
615.37
4,733.73
$59,007.43
$13,442.34 $596
$284.02
$473.36
$73,803.15
25. The Big Springs Lumber Co. of Alabama was incorporated on April 11, 1924, and liquidated and ceased to do business on or about November 30, 1930. Willey and Ratterman were president and secretary, respectively, of that company. The capital stock ledger account of the Big Springs Lumber Co. showed the outstanding stock, from the date of incorporation to dissolution, to have been held as follows: D. H. Willey
(715 shares at 100)
$71,500
D. H. Wilkinson
( 75 shares at 100)
7,500
E. E. Wilkinson
( 1 share at 100)
100
L. F. Ratterman
( 5 shares at 100)
500
*186 26. At some time prior to the liquidation of the Big Springs Lumber Co. Willey transferred to Ratterman without consideration 145 shares of his holdings in the Big Springs Lumber Co. This transfer was not shown on the capital stock ledger account of the Big Springs Lumber Co.Ratterman kept the books and prepared all the income tax returns of the Big Springs Lumber Co. during its entire existence. 27. At the date of its dissolution the records of the Big Springs Lumber Co. disclosed a liability on notes payable to Willey in the amount of $57,500, less $12,163.26 charged to Willey on the books of the company, or a net indebtedness to Willey of $45,336.74. 28. On November 7, 1930, the Big Springs Lumber Co. deeded, by a general warranty deed, all of its assets to Willey, as an individual. These assets consisted of approximately 3,500 acres of land in Clarke County, Alabama, also all the timber, timber contracts, rights of way, and all rights, privileges and easements owned by the Big Springs Lumber Co. incident to any such timber or to any of the fee simple lands described in the deed, and also the saw mill plant and equipment, all steel rails, "and all other property, whether *187 real or personal, of every kind and character, belonging to said Big Springs Lumber Company." Among other things the deed, which was received in evidence as Exhibit 5, recited that: "This conveyance is made pursuant to a resolution duly and regularly adopted by the Board of Directors of said Big Springs Lumber Company, with the consent of the holders of more than 75% of the capital stock of the Company, as authorized by Article 7 of the by-laws of said corporation, which Article 7 is as follows, to-wit: "The assets of this Company may be disposed of as an entirety by the Board of Directors, only on consent of the holders of not less than 75% of the capital stock of the Company." The deed was signed by Willey as president and attested to by Ratterman as secretary. The deed was filed for record on December 3, 1930 and was recorded in Deed Book 236, pages 322 and 323 in the office of the Judge of the Probate Court at Grove Hill, Clarke County, Alabama. 29. Sometime during December, 1930, after the deed (Exhibit 5) was recorded, Willey and the Co. entered into an agreement which was received in evidence as Exhibit 6 and is in full as follows: "Whereas, The Big Springs Lumber *188 Company, of Clarke County, Alabama, is to be liquidated, and is indebted to D. H. Willey, of Cincinnati, Ohio, in the sum of $57,500.00, on promissory notes for money advanced; and, "Whereas, D. H. Willey owns $57,000.00, and L. F. Ratterman $15,000.00, par value, of the Capital Stock of said corporation, being fully paid for, and said corporation owns assets on its books for $16,425.27, which are being transferred to D. H. Willey for said notes, less $12,163.26 already charged to him on the books of the Company; "Now therefore, in consideration of D. H. Willey holding the timber now growing, and which will grow, during the period of the next fifteen years, for the future use of The D. H. Willey Lumber Company, of Cincinnati, Ohio, the said The D. H. Willey Lumber Company agrees to pay the par value of the stock of The Big Spring Lumber Company held by D. H. Willey and L. F. Ratterman, and to pay D. H. Willey to the further extent of $28,911.47, if he does not realize more than $16,425.27 upon the assets transferred to him by The Big Springs Lumber Company, and if so then to the extent of $28,911.47 reduced by the amount realized in excess of said $16,425.27. "The D. H. Willey *189 Lumber Company is to have the advantage of the natural growth and development of the timber, in consideration for which it agrees to pay the foregoing amounts, in such future years when it may operate at a profit, by paying such amounts as it is possible to pay, as a rental for the said property and timber, to be deducted from its sales, or included in its costs, to be paid to D. H. Willey and L. F. Ratterman to reduce the amounts due to them from The Big Springs Lumber Company, as aforesaid. "With the growth and development of the timber, when in the future the said timber may be cut and manufactured into lumber, D. H. Willey agrees that all lumber purchased by The D. H. Willey Lumber Company shall be on a basis of a stumpage cost of Four Dollars, ($4.00), less per thousand feet board measure than whatever the current stumpage price may be at the time. "It is agreed that there is no fixed rental to be paid and if The D. H. Willey Lumber Company does not pay said amounts it shall forfeit any and all rights because of partial payments, and no rights are to attach to the said timber, and property upon which it stand, after December 31st, 1945. "December, 1930. "THE D. H. WILLEY *190 LUMBER COMPANY "/S/ L. F. Ratterman, V. P. "/S/ D. H. Willey" 30. In 1941, Betz became general manager of the Co. and the Co. paid him a bonus of $6,000. Of the total of $6,000 paid, $5,000 was paid under the following circumstances. Prior to receipt of the $5,000 Betz had agreed to pay it over to Willey in return for 50 shares of the capital stock of the Co. Certificate No. 27 for 50 shares of capital stock of the Co. was issued to Betz on December 4, 1941, signed by Ratterman and Willey as secretary and president of the Co. On December 11, 1941, a check for $5,000 was issued by the Co. to Betz who endorsed it to Willey. Willey, in turn, made a gift of $650 to Ratterman and a gift to Edward Geist of $75 and kept $4,275 for himself. The respondent determined that the receipt of this $650 represented a taxable dividend to Ratterman from the Co. 31. The net income of the Co. for the years 1936 through 1943 as determined by the respondent in his deficiency notices and prior to any adjustments which may or may not be necessary as a result of that company's petition to this Court is as follows: Net income
as determined by
Year
the respondent
1936
$21,283.75
1937
8,873.09
1938
30,333.93
1939
17,604.44
1940
23,951.28
1941
30,358.38
1942
20,764.07
1943
21,034.79
*191 The respondent determined that certain amounts received by the Co. from the Home Federal Savings and Loan Association and included by the Co. in interest income on certain of its returns were nontaxable as follows: Year
Amount
1939
$107.75
1940
125.00
1941
125.00
The Co. paid regularly declared dividends to its stockholders during the years here in question as follows: Year
Amount
1936
None
1937
None
1938
None
1939
$5,000
1940
5,000
1941
5,000
1942
5,000
1943
5,000
The balance sheets of the Co. which are a part of the returns filed for the years in question reported either a deficit or a surplus, as of December 31, as follows: As of December 31
Surplus
Deficit
1935
$16,404.31
1936
12,601.85
1937
8,759.68
1938
2,510.86
1939
$ 572.29
1940
4,279.35
1941
16,620.77
1942
23,437.89
1943
25,714.98
Issue 10. As shown in the statement attached to the deficiency notice in Docket 12080 the respondent increased the income tax net income as reported by petitioner for the year 1943 by an adjustment labeled "(c) Contributions $250" which he explained as follows: "(c) Due to the lack of *192 proper substantiation, your claimed deduction for contributions has been decreased $250.00 in accordance with the provisions of section 23(a) of the Internal Revenue Code." On his return for 1943 petitioner deducted $674.50 for contributions which he explained in Schedule D of his return as follows: Jesuits
$450.00
St. Mary's Church
174.00
War Chest
31.00
Miscellaneous
19.50
Total
$674.50
The respondent disallowed $250 of the above contributions without designating which of the above claimed contributions he disallowed. In his brief the respondent admits that the $250 which he disallowed was a part of the $450 deducted by petitioner as a contribution to the "Jesuits." During 1943 petitioner gave $200 to Father Dorger who is a Jesuit priest at the Milford Novitiate. They wanted to buy a farm and petitioner consented to pay a part of the cost. In addition to the above $200, petitioner, during 1943, gave to the Jesuit Order through one of his sons at least $250. This particular son is a member of that Order and is studying to be a priest. As such member he has taken a vow of poverty and any property given to him is immediately turned *193 into the Order. He has no money of his own. Any expense money that he may need is given to him by the Order as the occasion arises. He was at the Novitiate at Milford for four years. After that he was at West Baden for a while and for the last three years prior to the hearing herein he has been an instructor at Loyola College, a Jesuit institution, at Chicago. Issue 11. For each of the years 1937, 1939, 1940 and 1941 petitioner L. F. Ratterman's income tax returns were not false or fraudulent with intent to evade tax. For the year 1938 the joint income tax return filed by L. F. Ratterman and Claribel Ratterman was not false or fraudulent with intent to evade tax. The respondent did not determine fraud for the taxable year 1943 against Ratterman. There are no fraud penalties due from the respective petitioners for any of the taxable years here in question. Issue 12. The statute of limitations has barred any deficiencies that may be due for the taxable years 1937 and 1940. Opinion BLACK, Judge: We will consider the previously stated issues in their order. Issue 1. On the witness stand Ratterman categorically testified that he did not receive the amounts which, as stated *194 in our findings, the respondent determined he did receive as salary from the Auto-Vehicle Parts Co. and the D. H. Willey Lumber Co. He offered no further testimony as to why the items were omitted from his returns. Of course, with no cross examination on the part of counsel for the respondent as to Ratterman's testimony, such testimony might, standing alone, be sufficient to overcome the respondent's determination. The respondent, however, offered in evidence the returns of the D. H. Willey Lumber Co. which show that the company deducted $1,200 for each of the years here involved as representing compensation paid to Ratterman as an officer of the company. Ratterman signed each of those returns. For the years 1938 and 1939 the respondent allowed Ratterman to deduct as salaries paid $1,600 and $1,800, respectively, in addition to the amounts claimed on the returns, and for 1941 the respondent determined that Ratterman had reported excessive income from the Auto-Vehicle Parts Co. in the amount of $1,200. In his reply brief Ratterman attempts to explain all this by saying that his son had been performing certain services for him and that instead of paying him direct he caused the two corporations *195 to pay directly to the son the amounts which the corporations owed to the father. This would not relieve Ratterman of the duty to report as his own income the amounts so paid to his son. Ratterman has not proven that he was in turn entitled to deduct as compensation paid his son any amount in addition to that allowed by the respondent. The respondent's determination as to this issue is sustained. Issue 2. Under this issue we hold that Ratterman is entitled to deduct in accordance with our findings of fact as traveling expenses $225 for each of the years 1937, 1938, 1939 and 1940, as expenses incurred and paid in attending conventions. Apparently these were traveling expenses of a kind for which he would have been entitled to be reimbursed by one or more of the corporations of which he was an officer. However, he testified that he was not so reimbursed. Under these circumstances, we think he is entitled to the deductions claimed in this respect. Cf. Lewis F. Jacobson, 6 T.C. 1048; Benjamin Abraham, 9 T.C. 222. These should be allowed to the extent they have not already been allowed in respondent's determination of the deficiencies. In each of the years *196 named above petitioner claimed a deduction as business expenses of $300 for club dues paid to the Cincinnati Club. The evidence does not show what kind of a club it is - perhaps, it is an athletic club, we do not know. Mertens Law of Federal Income Taxation, section 25.79, volume 4 says: " § 25.79. - Club Membership Dues. Club memberships form a ready means of entertainment in the transaction of business. Whether the cost of such club membership in any particular case is deductible depends on the special facts of each case and requires proof as to the original purpose in taking out the membership, the extent to which the membership is used and the relationship of the use to the business activities of the taxpayer. Since in most instances there is a large personal element in a club membership, substantial evidence is a prerequisite to the allowance of club dues as a deductible expense." We consider that the evidence which the petitioner has offered as to these club dues payments is not sufficient to justify their allowance as business expenses. We so hold. Cf. George K. Gann, 41 B.T.A. 388 and cases there cited. Petitioner offered no evidence as to similar disallowances *197 by the respondent as those above discussed for the years 1941, 1942 and 1943 and as to these three years we sustain the respondent's determination relative to this issue. Issue 3. This issue involves whether or not $13,500 which Ratterman received from Fred Ratterman, John W. Cowell and Stuart E. Fletcher, members of the law firm of Ratterman, Cowell and Fletcher, represented gifts from these members of the law firm to Ratterman. We have found that they were not gifts. In our opinion, based upon all the evidence, these payments to Ratterman represented an unethical splitting of fees by the members of this law firm with Ratterman and Ratterman should have included such payments in his gross income for 1940. Issue 4. Our findings of fact under this issue show that of the $3,999.14 paid by Cowell to Ratterman in 1940 he owed Ratterman $1,948.29 for advances which Ratterman had made to Cowell in prior years for the purchase of office furniture and other uses. Manifestly this repayment to Ratterman of loans made by him to Cowell in prior years did not represent income to Ratterman in the year when repayment was made. In view of Cowell's further testimony that he had paid taxes on *198 the whole $6,250 in 1939 as his own income and that he intended to pay what he owed Ratterman when in 1940 he turned him over a check for $3,999.14 and that he intended the balance as a gift. We accept this version of the matter and hold that Ratterman is not taxable on any of the $3,999.14 involved in Issue 4. Issue 5. Regarding this issue the amounts claimed by petitioner on his return, the amounts disallowed and allowed by the respondent are set out in our findings of fact. The only evidence offered by petitioner as to this issue is his own testimony which is as follows: "The mileage necessary for me to conduct my business, as being an officer of the Naegele Dry Cleaning Company in Avondale, and the D. H. Willey Lumber Company at the back of Price Hill, the Cincinnati Sash and Door Company at Sixth and Freeman Avenue and to go to Frankfort, Kentucky, Lexington, and trips in Ohio and Indiana necessitates a mileage of at least 15,000 miles per year. I think the reasonable allowance which we allow the Cincinnati Sash and Door and other places, is 6" a mile. The Government, I was informed at Washington, allows only 5" a mile. That was in 1943 when I was down there." From this *199 testimony we have found that Ratterman used his automobile for business purposes to the extent of at least 15,000 miles during 1940 and 1941 and that his expenses in such use amounted to at least the amounts deducted by him on his returns for these years of $360 in 1940 and $330 in 1941. It follows that the respondent erred in disallowing $120 in 1940 and $110 in 1941. Cf. Albert Nelson, 6 T.C. 764. Issue 6. Petitioner has failed to prove that the respondent committed any errors as to this issue. On his returns for 1940, 1941 and 1942, Ratterman separately claimed deductions for automobile depreciation and automobile expenses. The amounts deducted by Ratterman and the amounts disallowed by the respondent are as follows: Automobile Depreciation
Automobile Expenses
Year
Deducted
Disallowed
Deducted
Disallowed
1940
$311.35
$103.90 $360 $120
1941
580.00
232.00
330
110
1942
580.00
232.00
400
None
The only evidence Ratterman has offered along this line has been in connection with the automobile expenses. We held under Issue 5 that he was entitled to the full amounts claimed on his returns for 1940 and 1941 of $360 *200 and $330, respectively. The respondent did not disallow any of the automobile expenses claimed for 1942. Since he has offered no evidence as to depreciation we must sustain the respondent's determination relative thereto. Issue 7. Under this issue we are to determine whether the respondent erred in disallowing $18, $2,282.78, $200 and $225 deducted by petitioner either as salaries or in lieu of salaries paid to others for the years 1940 through 1943, respectively. This is primarily a fact question. We have found in favor of the respondent for 1940 and in favor of the petitioner for 1942 and 1943. For 1941, we think the respondent erred to the extent of the $500 paid to his daughter and to the extent of $410 of the $910 paid to his son. In connection with the $910 paid to petitioner's son, the latter testified as follows: "Q. * * * Did I pay you $910.00 for the year 1941? "A. Yes, sir. "Q. And what was that for? "A. Those were for services rendered for the one month before I was sworn into the Federal Bureau of Investigation on February 3, 1941, and also by way of a bonus for the services because I was discontinuing my services with you as an assistant. "Q. That is, that *201 was an adjustment because you were leaving to join the Federal Bureau of Investigation? "A. That's right. Expenses were running pretty high. "Q. And that amount was agreed upon before you left? "A. Before I left, that's right." Section 23 (a) (1) (A) of the Internal Revenue Code allows as deductions from gross income "All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered." We think the $910 paid to Fred is in excess of a "reasonable" allowance for salaries for the time in 1941 up to February 3. We have found in our findings that $410 represents a reasonable allowance for the services actually rendered by Fred as an assistant to his father from January 1 to February 3, 1941. We, therefore, sustain the respondent's determination as to the year 1941 to the extent of the remaining $500 paid to Fred and also as to the $872.78 deducted by petitioner for the dictaphone. This latter amount was deducted by petitioner on the theory that it was in lieu of compensation paid for stenographic service. *202 There is no merit to such a contention. The expenditure was purely a capital one and the respondent has allowed petitioner a deduction for depreciation of the dictaphone from the date of its purchase to the end of the year. Issue 8. The question here is whether petitioner received income or a gift in 1941 from one C. J. Rennekamp in the amount of $7,360. If the receipt were a gift, it would be excluded from gross income and exempt from taxation under section 22 (b) (3) of the Internal Revenue Code. [1]
Ratterman testified at the hearing regarding this issue as follows: "Now for the year 1941 * * * I received $7,360.00 by way of stock which was given to me. I think it was 800 shares of stock of the Auto-Vehicle Parts Company, which was given to me by Mr. Rennekamp. "For years, *203 from the time of the beginning of that corporation Mr. Rennekamp and I had been associates together in business. At one time I was president of the company and after his death I again became president of the company until his widow sold his stock. Now that stock was issued to me and in my name for some time prior to the year 1941. It was endorsed in blank and in Mr. Rennekamp's possession. "In other words, I had no stock except what might be termed qualifying shares in the Auto Vehicle Parts Company, as I recall. That stock remained that way until the year 1941 and I believe it was about along in January, 1941, or it may have been later on, Mr. Rennekamp told me that the stock which had been in my name and was mine as a matter of record and had been for several years, he wanted to turn over to me as a gift. It was given to me as a gift by Mr. Rennekamp. He was not indebted to me for anything at the time and I accepted it as such. "I did not return it because I regarded it as nontaxable capital income." There being no testimony to the contrary, we think it is reasonable to hold that the stock in question was received as a gift and we have so found as an ultimate fact. It follows *204 that the respondent erred in including the value of the stock in petitioner's income for the year 1941. Issue 9. Did the respondent err in determining that certain distributions received by Ratterman from the D. H. Willey Lumber Co. in 1937 through 1943 constitute taxable dividends? As set out in our findings the company either understate its sales, overstated its purchases, omitted items of income or deducted amounts as rental paid for certain years as follows: Year
Par. of Facts
Amount
Total
1936
6
$11,395.97
7
3,707.55
8
1,292.45
9
604.03
$17,000.00
1938
12
4,533.67
13
4,533.67
14
15,000.00
24,067.34
1939
15
4,733.67
16
4,333.67
9,067.34
1940
17
4,733.67
19
4,733.67
9,467.34
1941
20
4,733.67
4,733.67
1942
22
4,733.73
4,733.73
1943
23
4,733.73
4,733.73
Grand total
$73,803.15
This $73,803.15 was distributed to the stockholders of the company as set out in paragraph 24 of our findings. All of these distributions, except the $15,000 item in 1938, were made on the basis of stock ownership. Of the amounts received by Willey and Ratterman as set out in paragraph 24 of our findings, the respondent *205 determined, under section 115 of the Revenue Acts of 1936, 1938 and of the Internal Revenue Code, that the amounts taxable to Willey and Ratterman as dividends were as follows: Percentage
Year
Willey
Ratterman
taxable
1937
$ 7,301.77
$ 514.87
46.806%
1938
15,232.88
7,498.94
95.116%
1939
6,458.78
982.04
83.311%
1940
8,094.58
1,230.76
100%
1941
8,085.67 [2]
1,254.53
100%
1942
3,810.67
615.37
100%
1943
4,118.36
615.37
100%
Regarding the year 1941, the amount of $1,254.53 is the net aggregate of three items as follows: Distribution from D. H. Willey Lumber Co.
$ 615.38
Gift from Willey and erroneously determined by the respondent to be a
distribution from the Company
650.00
$1,265.38
Less excessive dividends reported by Ratterman from other sources
10.85
Adjustment to net income as determined by the respondent
$1,254.53
Ratterman contends that he is not taxable on any of *206 the amounts received from the D. H. Willey Lumber Co. during the years 1937 through 1943 on two grounds: (1) that he is entitled to have his investment in the Big Springs Lumber Co. returned to him tax free before he is taxable on any amount paid to him by the D. H. Willey Lumber Co. and (2) that since the latter company had deficits during certain of the taxable years, it would be precluded under Ohio law from paying any dividends as long as the deficits continued. We think both of these contentions are without merit. In the first place, Ratterman did not prove what his investment in the Big Springs Lumber Co. was and, even if he had, such proof would have been immaterial in these proceedings for the reason that whatever investment he may have had in that company was lost in 1930 when that company was liquidated and all of its assets were transferred to Willey in partial payment of the indebtedness owed to Willey by the Big Springs Lumber Co. The fact that the D. H. Willey Lumber Co. may have had deficits during certain years is also immaterial in these proceedings. Section 22(a) of the Revenue Acts of 1936, 1938 and of the Internal Revenue Code includes "dividends" in gross income. *207 Section 115(a) of the same statutes defines the term "dividend" as "any distribution made by a corporation to its shareholders * * * out of the earnings or profits of the taxable year" and section 115(b) of the same statutes provides that "every distribution is made out of earnings or profits to the extent thereof, and from the most recently accumulated earnings or profits." The respondent in arriving at the percentage taxable took into consideration the net income of the company as adjusted by him, the nontaxable income, the tax liability of the company as shown in the deficiency notices, any unallowable deductions of the company, and any other distributions paid by the company in addition to the amounts paid under Exhibit 6. This was proper, but since some of these factors will be changed as a result of that company's petition to this Court, it will be necessary for the parties to recompute the percentage taxable to Ratterman of the amounts set out in paragraph 24 of our findings, and we so hold. This recomputation will be made under Rule 50. Issue 10. Did the respondent err in disallowing $250 of the contributions claimed by petitioner on his return? On his return petitioner *208 deducted $674.50 as contributions among which was $450 to the "Jesuits." The respondent in his brief admits that the $250 which he disallowed was a part of the $450 claimed by petitioner on his return and that the Jesuit Order is such a religious foundation to which contributions are allowable under section 23(o) of the Internal Revenue Code, as amended. In his brief the respondent says "The only question is whether petitioner paid $250 to or for the use of that Order which respondent has not allowed." In this connection petitioner testified at the hearing that during 1943 he gave $200 or $250 to a Jesuit priest at the Milford Novitiate and that in addition thereto he gave one of his sons who is studying to be a priest and who is a member of the Jesuit Order at least $250. He further testified that as a member of that Order the son had taken a vow of poverty and under this vow he was required immediately to turn in to the Order all property given to him. When asked by the Court how the additional $250 was paid, Ratterman and the Court continued as follows: "THE WITNESS: I paid it to the Jesuit Order. He turns it in immediately. Any member of the Jesuit Order *209 has no money of his own. "THE COURT: You paid the money to him? "THE WITNESS: I paid it to the Jesuit Order, your Honor, because he has taken a vow of poverty. He's not permitted to accept any money. See, the Jesuit Order is an order where those joining dedicate themselves to poverty and have no property and anything given to him is immediately turned in. He has no money. If he takes the Elevated down to the Loop in Chicago he gets money from the office as he goes out, to pay his way." We are satisfied from the evidence that petitioner has proven that during the year 1943 he contributed at least $250 to or for the use of the Jesuit Order by giving at least that amount of money to his son who under his vow of poverty was required immediately to turn it over to the Order of which he was a member. We hold that the respondent erred in disallowing $250 of the contributions claimed by petitioner on his return. Issue 11. The question here is whether the respondent erred in asserting fraud penalties against Ratterman for the years 1937, 1939, 1940 and 1941 and against Ratterman and his wife for the year 1938. The applicable statutory provisions are section 293(b) of the Revenue Acts *210 of 1936 and 1938 and of the Internal Revenue Code. Since all of these provisions are substantially the same we will set out in the margin only the provisions of the Code. [3] "Fraud is a fact to be proven by clear and convincing evidence." Charles E. Mitchell, 32 B.T.A. 1093, 1128, affirmed 303 U.S. 391. The burden of proving fraud is upon the Commissioner. Section 601, Revenue Act of 1928 (applicable for the taxable years here involved of 1937 and 1938); and section 1112, I.R.C. (applicable for the years 1939, 1940 and 1941). We hold that under the evidence fraud has not been convincingly established. As shown in our opening statement there are principally two types of adjustments made by the respondent which are primarily responsible for the deficiencies here in question. These two types *211 of adjustments relate to Ratterman's net income from his business or profession and the distributions he received from the D. H. Willey Lumber Company. Regarding the first type there are many minor adjustments such as income from two corporations which belonged to Ratterman and which Ratterman had ordered paid directly to his son Fred for services Fred had performed for him; and the disallowance by the respondent of certain minor expenses for office, advertising, travel, automobile expenses and depreciation and salaries. We have sustained the respondent's determination as to some of these minor adjustments and reversed his determination as to others. We do not think, however, that any deficiency that may be due to any of these minor adjustments wherein we sustained the respondent's determination is due to fraud with intent to evade tax and we so find and hold. Included among the first type of adjustments are two major adjustments in 1940 regarding the Layer estate of $13,500 and $3,999.14 and one major adjustment in 1941 regarding the Rennekamp gift of $7,360. As to this latter adjustment we held under Issue 8 that the shares of stock having a value of $7,360 received by Ratterman *212 in 1941 were received as a gift from Rennekamp and as such were not income to Ratterman and of course there could be no fraud involved as to that adjustment. As to the $13,500 which Ratterman received in 1940 from the law firm of Ratterman, Cowell and Fletcher we have found that it was not a gift but in effect was a splitting of fees by the law firm with Ratterman and that he should have included the $13,500 as a part of his gross income for 1940. We think it was clearly taxable income. However, all three members of the law firm testified at the hearing and each insisted that he intended to make Ratterman a gift of the amount which he paid Ratterman and so informed Ratterman at the time. While we are not at all convinced by the testimony of these witnesses that such payments were gifts, we think we would not be justified in view of this testimony in holding that Ratterman was guilty of fraud in omitting these payments from his 1940 income tax return. There can be but little doubt, we think, relative to Issue 4 but that $1,948.29 of the $3,999.14 paid to Ratterman by Cowell in 1940 was no more than a reimbursement by Cowell for the cost of office furniture and fixtures and advances *213 and was not income to Ratterman and he was therefore guilty of no fraud in not reporting that amount. After careful consideration of the evidence we have held that the remainder of the $3,999.14 was a gift by Cowell to Ratterman and this being the case, the omission by Ratterman of this amount from his 1940 return could not be the basis of fraud. The facts relating to the second type of adjustments concerning the distributions Ratterman received from the D. H. Willey Lumber Co. are set out at considerable length under Issue 9, supra. The amounts actually received by Ratterman appear at paragraph 24 under that issue. We are reasonably convinced by the evidence that the Company, Willey and Ratterman all thought that they had in the execution of Exhibit 6 devised a plan by which Ratterman and Willey could recoup their losses in the Big Springs Lumber Company and the D. H. Willey Lumber Co. could secure a deduction of the payments made as so-called rentals. The evidence is to the effect that Ratterman and Willey took no losses in their income tax returns on their investments in the stock of the Big Springs Lumber Company when it was liquidated in 1930 and the main reason why they did *214 not was because of the execution of this written agreement, Exhibit 6, which was executed soon after the liquidation took place. It is true, as we have already pointed out in our findings of fact and opinion, this liquidation of the Alabama company was complete in 1930 and whatever losses Ratterman and Willey incurred by reason of such liquidation should have been taken then and there and they could not recoup them in the manner which they sought to devise. We are not convinced, however, under all the facts and circumstances which we have in this record that we should hold that they were guilty of fraud because of these attempts. In Mitchell v. Commissioner, 118 Fed. (2d) 308, reversing 40 B.T.A. 424, the court held that "fraud" within the statute providing for unlimited period for assessment in case of false or fraudulent returns and the statute providing for penalty of 50 per cent additional because of "fraud" in tax return with intent to evade the tax means actual intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing, and mere negligence, whether slight or great, is not equivalent to fraud. This opinion *215 of the circuit court was followed by us in a supplemental opinion in William E. Mitchell, 45 B.T.A. 822. Therefore, on the facts which we have endeavored to set out fully in our findings of fact and without unnecessarily prolonging this discussion, we hold that petitioner L. F. Ratterman's returns for the taxable years 1937, 1939, 1940 and 1941 and petitioners L. F. Ratterman's and Claribel Ratterman's return for the taxable year 1938 were not false and fraudulent with intent to evade tax and the 50 per cent fraud penalties determined by the respondent are not sustained. Issue 12. In view of our holding under Issue 11, and in view of the respondent's concession referred to in our opening statement, it follows that the assessment or collection of any deficiencies against Ratterman for the years 1937 and 1940 are barred by the statute of limitations. Decisions will be entered under Rule 50. Footnotes
1. Includes 75 shares of the Co. treasury stock each received on December 20, 1938. This amount consists of the $3,810.60 received by Willey from the Company, $4,275 of the $5,000 received from Betz in payment for 50 shares of stock of the Company, and of an error on the part of the respondent of 7 cents.
[2] Henry Geist died and his 15 shares went to his nephew, Edward H. Geist in 1940. SEC. 293. ADDITIONS TO THE TAX IN CASE OF DEFICIENCY. * * *
(b) Fraud. - If any part of any deficiency is due to fraud with intent to evade tax, then 50 per centum of the total amount of the deficiency (in addition to such deficiency) shall be so assessed, collected, and paid, in lieu of the 50 per centum addition to the tax provided in section 3612 (d) (2).
[3]↩ Purchased from D. H. Willey in 1941.
1. SEC. 22. GROSS INCOME * * *
(b) Exclusions from Gross Income. - The following items shall not be included in gross income and shall be exempt from taxation under this chapter: * * *
(3) Gifts, Bequests and Devises. - The value of property acquired by gift, bequest, devise, or inheritance (but the income from such property shall be included in gross income);↩