C. J. D. RUDOLPH and Irma M. Rudolph, Appellants,

v.

UNITED STATES of America, Appellee.

No. 18788.

United States Court of Appeals Fifth Circuit.

June 27, 1961.

Rehearing Denied July 28, 1961.

**842**

Richard A. Freling, B. Thomas Mc-Elroy, Felix Atwood, Dallas, Tex., for appellants.

Meyer Rothwacks, Lee A. Jackson, Dept. of Justice, Washington, D. C., William B. West, III, U. S. Atty., Fort Worth, Tex., W. E. Smith, Asst. U. S. Atty., Dallas, Tex., Abbott M. Sellers, Acting Asst. Atty. Gen., Louis F. Oberdorfer, Asst. Atty. Gen., I. Henry Kutz, Norman H. Wolfe, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before JONES and BROWN, Circuit Judges, and DE VANE, District Judge.

PER CURIAM.

The facts are set forth in the opinion of the district court. Rudolph v. United States, 189 F.Supp. 2. The applicable law is to be found in Patterson v. Thomas, 289 F.2d 108, decided by this

Court on March 16, 1961. No factual differences call for the application of a different rule or the reaching of a different result than in Patterson v. Thomas. The judgment of the district court is

Affirmed.

JOHN R. BROWN, Circuit Judge (dissenting).

To what was urged by my dissent in Patterson v. Thomas, 5 Cir., 1961, 289 F.2d 108, at page 114. I would add brief comments on a few matters bearing emphasis in this record.

The notion that this was one big happy company-paid-for-holiday in New York City where a formal session for the first half day was a mere tip-of-the-hat to give appearances of a working trip is simply unfounded. Mr. Rudolph, the Taxpayer, and his wife—a companion, coworker, partner-in-fact in the business of life insurance business as well as fellow Taxpayer—had nothing to do with selecting the time, the place, or the program. All was planned, precisely as to moment, locality, event and eligible participants. Moreover, it was not, as the Government seeks to make it appear, a long trek for a half of a day's formal business activity. Those selected by Southland Life Insurance Company were required to travel together. This group of 293 [1] made up of 151 men and 142 wives drawn from the South and Southwest were compelled to come to Dallas where they became passengers on "two convention special trains." The trains departed on Tuesday, December 11. Nearly 48 hours later and about 3:00 p. m. Thursday, December 13, the trains were to arrive at Jersey City, New Jersey, where special chartered buses took the travelers to the Waldorf-Astoria. On Sunday morning similar buses took all from the hotel to the trains for the return trip by the convention special trains arriving back in Dallas some time on Tuesday, December 18.

---

1. The breakdown was as follows: agents 102, wives 97; salaried field assistants 3, wives 3; assistant managers 2, wives 2; managers 17, wives 17; officers 27, wives 23.

It is not, therefore, a case of employees getting together for the half-day's session on Friday, December 14, with all remaining time free. Out of the approximately 149 hours from Tuesday, December 11, to Tuesday, December 18, in the neighborhood of 96½ of them were spent in enforced togetherness. It is neither an exaggeration nor does it require more than an amateur license as a lyrist to contemplate that with the rhythmic clickety-clack of the wheels as this train made its way to and from New York City and Dallas, each recipient was reminded of the company message in a syncopated way. And a part of that message was that the company intended that all who were asked to attend would do so. Of course in the psychological complex of a sales business this point was not made crudely. Where in Thomas management phrased it as "frowning" on any who declined the trip, Southland has euphemisms of equal portent. Its agency vice president, after stating that an agent indicating he would not attend was required to give an explanation, testified that "if he [the agent] doesn't have a proper reason it would be looked upon with serious displeasure."

This convention trip was meant for the agent's own good. Of course that was equated with the company's good for it was wise psychologically and ethically legitimate to conclude that what was good for the agents was good for Southland. The emphasis was not really the pointed one of increasing sales. That, and the company's benefit, was to come primarily from reassuring the agents that things were not really as bad as they seemed. High officials testified without contradiction that in the life insurance sales business where there are so many "turndowns" by prospects, it is essential to buoy up the spirits of these solicitors. This, experience proves, is best accomplished through the constant, close association on an informal semi-social basis of many successful salesmen who have weathered and overcome similar discouragements.

The insidious purpose—here used with no moral overtones of disparagement—of the company's theme on the minds and wills of its captive audience, was exemplified in the most intense fashion by the Friday luncheon at the Hotel Waldorf-Astoria which ostensibly had no specific relation to selling life insurance. One of the nation's outstanding ministers and public speakers, renowned for his syndicated writings, television and radio appearances, was the luncheon speaker. But even this was not left to chance. The company, by letter, outlined to him the nature of the meeting and suggested that the talk be "of an inspirational nature, along the lines of achievement, success and happiness that can be obtained through proper attitudes of faith and practices of the well-ordered personal life." After discussing the nature of a life insurance agent's work and the essential motivation of genuine service to his clients, management's estimate of the importance of these things was stamped by this conclusion in the letter. "Therefore, the degree of success and satisfaction obtained from his work depends not just entirely upon his knowledge of life insurance, but to a very large degree depends upon his attitudes toward his opportunities and his zeal to excel." It is not surprising that the agency vice president testified of this speech that this speaker "did a better job than I had hoped he would" and that the speaker "did mention something specifically about the work of an insurance man * * *" and "he knew more about it than I did."

Unlike Thomas which concentrated on the practice followed by that particular life insurance company, this record contains the uncontradicted testimony of the Managing Director of the Life Insurance Agency Management Association. This is an industry-supported organization interested in research, management consultation, education and training, and publications in the life insurance business. From his 30-years' experience in life insurance from the management point of view, this witness outlined why manage-

ment would consider it good business to spend $84,000, as was done here, on such a convention for its leading agents. He emphasized the importance of personal contact in an informal setting among those who either were top flight producers or had shown promise. This included the opportunities for intimate associations with high level executives under circumstances which afforded ample time free from the diversion of workaday problems were such meetings undertaken in home office surroundings during working hours.

Indeed, as in Thomas, the Government does not question this. It acknowledges, as it must, that this is a legitimate expenditure by the employing life insurance company. But it is precisely at this point that the whole matter reaches its climax: if an event is of such importance in management's eyes, it is certainly not something which the company considers the agent may accept or decline on a take-it-or-leave-it basis. In other words, what the company does for the agents' (and its) good is known by both to be important and expensive. What is tendered must be accepted unless there is a real good excuse. This record, therefore, reiterates with emphasis the actual, psychological, economic pressure of compulsion under which the agent (and his wife) are coerced into taking what is offered.

The future economic livelihood of an agent under a contract granting the employer the right of termination at will is the thing at stake. To take a trip to preserve that security is something not done primarily for personal enjoyment. Conceding that the $560 cost must be attributed to Taxpayer as income, it rejects this record to conclude that it is a matter of voluntary personal enjoyment when the employee *must* take the income, *pay* tax on it, *spend* it precisely as *directed* by the *donor* and then treat it as though this were an ordinary personal junket of a family on a holiday. In a real and vital sense the money is spent for business and business reasons only. It is indispensable. What is indispensable is certainly ordinary and necessary.[2]

In the realistic formula of "ordinary and necessary," life insurance agents under such compulsion should have like treatment accorded to others. Deductions have been allowed as "ordinary and necessary" to clergymen attending a

2. Both on this underlying issue and the subsidiary one of allocation and apportionment the relative cost to be able to attend the formal business sessions in relation to the total $560 attributed income, is substantial either on the basis of the husband alone or husband and wife together. In other words it cost Taxpayer alone a minimum of $215.41 to be able to attend the half-day sessions in New York. These facts are not disputed:

| Expense | Cost per person | Cost per couple |
|---|---|---|
| Meals in New York | | |
|     1 breakfast | $ 2.00 | $ 4.00 |
|     1 luncheon at Waldorf | 6.00 | 12.00 |
| Round trip train fare | 119.40 | 238.80 |
|     Pullman cost | 37.13 | 74.26 |
| Rail meals | 30.54 | 61.08 |
| Baggage, porter & dining car tips | 8.23 | 16.46 |
| Hotel New York | | |
|     (1 day) (approximately ⅓ on | | |
|     basis 3 days actual cost) | 12.11 | 24.22 |
| | $215.41 | $430.82 |

church convention;[3] to expenses of an employee attending conventions of a related business group;[4] to a lawyer attending a meeting of the American Bar Association;[5] to a legal secretary attending the national convention of the National Association;[6] to physicians attending medical conventions;[7] to certified public accountants attending conventions;[8] to university teachers in attending conventions or scientific meetings;[9] to professional cartoonists attending political conventions;[10] to persons attending the Red Cross Convention;[11] to school teachers attending summer school;[12] to attorneys attending an institute on Federal taxation;[13] to employees sent to refresher courses to become more acquainted with new processes in the industry;[14] to a furniture store sending its buyers to the annual furniture mart;[15] to representatives to annual conventions of trade associations;[16] and to an insurance agent away from home on business.[17]

This Court recently held in Williams v. Patterson, 5 Cir., 1961, 286 F.2d 333, that expenditures made by a railroad conductor on his layover period of six hours were deductible even though all of the activities could narrowly be classified as "personal activities." In doing so we said: "although most of these factors, in a narrow sense, affect the personal convenience of the traveler, the motivation for sleep and rest arises from the exigencies of the employment, the business demands of the employer, the relation of the employee to his employer. * * *" Then we concluded the correct rule to be that expenditures made "in order to meet the exigencies of his employment or the business demands of his employment" are properly deductible. 286 F.2d 333, at pages 339–340.

The contemporary interest in possible legislative changes suggests that perhaps the understandable, realistic "ordinary and necessary" formula produces results unsatisfactory to the revenue, undesirable from a socio-economic point of view or impossible of orderly administration. That may be so but the remedy is for Congress. Until then we have to view the formula in the light of the facts. Here, in my judgment, these facts show an honest, legitimate, ethical expense. More than that these facts compel a finding of absolute business compulsion when viewed from the standpoint of the agent's economic security.

I therefore dissent.

3. Marion D. Shutter, 2 B.T.A. 23.

4. Ratterman et al., 7 T.C.M. 476, affirmed without opinion, Ratterman v. C. I. R., 6 Cir., 1949, 177 F.2d 204.

5. Ellis v. Burnet, 1931, 60 App.D.C. 193, 50 F.2d 343.

6. Rita M. Callinan, 12 T.C.M. 170.

7. Robert v. Coffey, 1931, 21 B.T.A. 1242; Wolfe v. McCaughn, D.C.E.D.Pa., 1933, 5 F.Supp. 407; Ray Upham, 1929, 16 B.T.A. 950; J. Bentley Squier, 1928, 13 B.T.A. 1223; Cecil M. Jack, 1928, 13 B.T.A. 726.

8. Charles O. Gunther, Jr., 54,287 P–H Memo T.C.

9. Alexander Silverman, 6 B.T.A. 1328.

10. Jan N. Darling, 4 B.T.A. 499.

11. Henry Cartan, 30 T.C. 308.

12. Hill v. Commissioner, 4 Cir., 1950, 181 F.2d 906.

13. Coughlin v. Commissioner, 2 Cir., 1953, 203 F.2d 307.

14. Pacific Grape Products Co. v. Commissioner, 17 T.C. 1097 (reversed on other points, 9 Cir., 1955, 219 F.2d 862).

15. Finkenburg's Sons, Inc., 1952, 17 T.C. 973.

16. I.T. 2602, 1931 Cum.Bull. 130.

17. Summerour v. Allen, D.C.M.D.Ga., 1951, 99 F.Supp. 318.