**HUMBLE OIL & REFINING COMPANY**

*v.*

**The UNITED STATES.**

**No. 392–67.**

United States Court of Claims.
May 14, 1971.

Davis, J., dissented in part and filed opinion.

David W. Richmond, Washington, D. C., attorney of record, for plaintiff, Miller & Chevalier, Walter B. Morgan, Roger Bonney, John J. Hollis, and Robert L. Moore II, Washington, D. C., of counsel.

Frances M. Foltz, Washington, D. C., with whom was Asst. Atty. Gen. Johnnie M. Walters, for defendant, Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 134(h). The commissioner has done so in an opinion and report filed on June 5, 1970. On August 19, 1970, defendant filed exceptions to the commissioner's findings, opinion and recommended conclusion of law. Thereafter, on September 18, 1970, the court granted a joint motion to consolidate this case and No. 343–68 (Humble Pipe Line Company v. United States, Ct.Cl., 442 F.2d 1353, a case in which Trial Commissioner Mastin G. White had filed an opinion and report on August 17, 1970), for further proceedings. On October 17, 1970, defendant filed a supplemental brief on consolidation and exceptions. The cases have been submitted to the court on oral argument of counsel and the briefs of the parties.

Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in the case.* (See also the opinion of this date in the consolidated and companion case, No. 343–68, 442 F.2d 1353, referred to above.) Therefore, plaintiff is entitled to recover and judgment is entered for plaintiff with the amount of recovery to be determined pursuant to Rule 131(c) in accordance with this opinion.

## OPINION OF COMMISSIONER

FLETCHER, Commissioner: Once again the court is called upon to consider the troublesome area of the tax treatment properly to be accorded payments, or reimbursements, by an employer of his employees' moving expenses. See, Ritter v. United States, 393 F.2d 823, 183 Ct.Cl. 875 (1968), cert. denied, 393 U.S. 844, 89 S.Ct. 127, 21 L.Ed.2d 115 (1968). The question now presented is a refinement of the issue considered in Ritter.

Having successfully contended there (and also in other cases) that certain moving expense payments and reimbursements were taxable income to the recipient-employee, the defendant now moves forward another step and says that, since the payments and reimbursements were admittedly income to the employee, it was the duty of the employer to withhold income taxes thereon just as he is required to do in the case of salary or wage payments. In my opinion, the withholding requirement on "wages" contained in section 3402 of the Internal Revenue Code of 1954 cannot be carried to the extent now urged by defendant.

In summary, the facts are these. For many years the plaintiff, Humble Oil & Refining Company, has been engaged in various aspects of the petroleum business, and it has offices and other facilities in numerous locations throughout the United States. As might be expected, the maintenance of these widely scattered offices has quite frequently resulted in the movement of numerous of its employees from one location to another.

---

* The opinion of Davis, Judge, dissenting in part, follows the opinion of Trial Commissioner Fletcher which has been adopted by the court.

When this has occurred, plaintiff has borne the bulk of the moving employees' expenses either by way of direct payment thereof, or by way of reimbursement to the moved employees, or by a combination of both. This policy of Humble was well-known to its employees, and whenever they were asked to move from one location to another, not much thought was given by them to the matter of moving expenses. The important thing was the fact that their jobs were being moved. Hence, the primary decisional factor was the question of whether they desired to continue working for Humble or to seek employment elsewhere. Usually, an employee's old job was available to him only in the new location and only a lesser position, or perhaps none at all, was open in the old location. Occasionally an employee was offered a better position and a higher salary in the new location. In any case, however, Humble offered to pay or reimburse its employees for most of their moving expenses.

Essentially, the present dispute arose out of a decision by plaintiff in 1960 when it determined to move the entire New York City headquarters of the former Esso Standard Oil Company (which company had been merged into plaintiff in 1959) to Houston, Texas. This move of the Esso operation from New York to Houston took place in 1961. In order to achieve the move with as little disruption as possible, plaintiff requested hundreds of its New York employees, both managerial and clerical, to move from New York to Houston. The employees were formally advised that the company, under its "resettlement policy," would either directly pay for, or reimburse such employees, for the bulk of their expenses incurred in moving. As one witness described it, the promise of the company was to make the moving employee "whole" to the end that he would not be "out of pocket to a great extent."

During 1961, Humble paid, or reimbursed, its employees, both old and new, for the following moving expenses, the bulk of which involved the New York to Houston move:

(a) Moving expenses incurred by new employees: Expenditures for moving household goods and personal effects to new locations, transportation of families to the new locations, and meals and lodging en route to the new locations _____ $46,130.98

(b) Expenses incurred by existing employees in moving themselves, their immediate families, and household goods and personal effects to the new locations _____[1] 1,945,438.23

(c) Expenses incurred by existing employees in the sale of their residences: Brokers' commissions, expenditures in preparing residences for sale, costs of advertising, mortgage prepayment penalties, closing costs and fees _____ 959,205.43

(d) Expenses incurred by existing employees in purchasing new residences: House hunting trips, intertest on loans, expenditures for acquiring mortgages and securing title policies, recording fees, loan papers, credit reports, surveys, restrictions, escrow fees, closing costs and fees 443,224.03

(e) Expenses incurred by existing employees in occupying new residences: Installation of appliances, refitting rugs and drapes, painting, decorating and carpentry _____ 240,711.80

(f) Other expenses incurred by existing employees: Interim living expenses, expenses of interim trips to new locations, and miscellaneous expenses _____ 767,109.89

(g) Amounts paid to existing employees representing in the case of each employee to whom payment was made, an amount equal to 75 percent of the excess of an appraised value of the employee's old house over its actual selling price (provided that the employee placed his house for sale on multiple listing, or with two or more brokers, and then was unable to sell the house for as much as its appraised value) _____ 323,357.10

---

1. These so-called "direct" moving expenses of existing employees are not in dispute. The Internal Revenue Service does not require the payment or reimbursement of such moving expenses to be included in the gross income of the employee-recipient. *See* Rev.Rul. 54–429, 1954–2 C.B.

53. For a discussion of the difficulty, in theory, of drawing a distinction between "direct" and "indirect" moving expenses, see the opinion of Davis, J., concurring in part and dissenting in part in Ritter v. United States, *supra*, 393 F.2d 832, 183 Ct.Cl. 890.

Plaintiff did not withhold income taxes on these payments. Insisting that plaintiff was required by law to do so, the Commissioner of Internal Revenue assessed deficiencies in withholding taxes against plaintiff who paid them and thereafter filed a timely claim for refund. Parts of that claim have been settled administratively, but there remains in controversy the sum of $500,-353.04 plus assessed interest. This amount was computed by applying the 18 percent withholding rate to all the payments listed above except the direct moving expenses to existing employees set forth in category (b). See footnote 1, *supra.*

Section 3402 of the Code requires withholding only on "wages" as defined by section 3401 reading, in pertinent part, as follows:

(a) WAGES.—For purposes of this chapter, the term "wages" means all remuneration (other than fees paid to a public official) for services performed by an employee for his employer, including the cash value of all remuneration paid in any medium other than cash; * * *

Plaintiff's position, of course, is that the reimbursements and payments in question do not constitute remuneration "for services performed." If statutory words are to be given their ordinary, everyday meaning, plaintiff's position would appear to be quite correct, at least with respect to payments to its existing employees. No service was performed by plaintiff's employees in order to obtain these reimbursements, unless it be the act of physically moving from one permanent job location to another at plaintiff's request, and in the case of existing employees the Government does not even contend that the reimbursement of expenses incurred in such physical movement (so-called "direct" moving expenses) are income subject to withholding.

What the Government does contend is clear from its heavy reliance on this court's decision in Ritter v. United States, *supra.* There, essentially the same type of reimbursements and payments for employee moving expenses were involved as here. The plaintiff in *Ritter,* however, was the employee, not the employer, and the question was whether the payments to him constituted ordinary income and, if so, whether he was entitled to deduct as expenses the items for which payments were made. The court adopted, *per curiam,* the opinion of Chief Commissioner Bennett holding that the payments were ordinary income to the employee and were not deductible by him.

To defendant, the *Ritter* case is completely dispositive of the present one in the Government's favor. I do not agree. Mr. Justice Frankfurter has wisely remarked that in law, as elsewhere, "the right answer usually depends on putting the right question." Estate of Rogers v. Commissioner of Internal Revenue, 320 U.S. 410, 413, 64 S.Ct. 172, 174, 88 L.Ed. 134 (1943). The "right question" in *Ritter* was whether the payments were income to the employee-taxpayer under the sweeping provisions of section 61(a) (1) of the 1954 Code defining gross income as "all income from whatever source derived, * * *." Here, the "right question" is much narrower and is simply whether the payments were "remuneration * * * for services performed" so as to constitute "wages" on which plaintiff was required to withhold income taxes pursuant to section 3402.

The answer to that question cannot be found in *Ritter* and the numerous cases discussed therein holding these payments to constitute income to the employee-recipient. It is true, as defendant emphasizes, that in the *Ritter* opinion the type of payments here involved are described in several instances as "compensation," and within the broad category of income receipts, the description is accurate enough. Clearly, an employee may receive taxable "compensation" from his employer in forms other than salary or wage payments. *See,* for example, Commissioner of Internal Revenue v. LoBue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed.

1142 (1965) holding that the exercise of stock options given an employee by his employer to get "better work" from him resulted in taxable income to the employee under the broad provisions of section 61(a)'s predecessor. Hence, *Ritter* was entirely correct in its essential finding that any employer payment which constitutes an "economic gain" to an employee must be included in his taxable income. 393 F.2d 823, 183 Ct.Cl. at pp. 889–890.

However, at no time did the *Ritter* decision refer to the payments in question as compensation "for services performed." Section 3401, *supra*. And, for purposes of the withholding requirements, the quoted words are crucial.

For this reason, one must look beyond *Ritter* for the solution of the present problem. In my view, the correct answer is found in the cases of Peoples Life Insurance Company v. United States, 373 F.2d 924, 179 Ct.Cl. 318 (1967); England v. United States, 345 F.2d 414 (7th Cir., 1965), *cert. denied* 382 U.S. 986, 86 S.Ct. 537, 15 L.Ed.2d 475 (1966); and Acacia Mutual Life Insurance Co. v. United States, 272 F.Supp. 188 (D.Md., 1967).

In the *Peoples Life* case, the taxpayer had paid all convention expenses of certain of its employees who, by reason of their work output, were invited (wives included) to taxpayer's annual conventions. In holding that these payments did not constitute "wages" on which the employer was required to withhold income taxes,[2] the court stated at 373 F.2d 928–929, 179 Ct.Cl. 327–328:

> Viewed against the background of all the facts, it seems clear that plaintiff is correct and that these convention expenses are not fairly to be considered as "remuneration for services performed by an employee for his employer." On this record, there would be no justification for rejecting the entirely credible showing plaintiff makes to the effect that the conventions were important ingredients of its total corporate effort to build a stable, knowledgeable, and loyal agency force, upon which its very existence depends. As such, the convention costs were, from plaintiff's point of view as an employer, expenditures incurred to advance its own wholly legitimate and bona fide business purposes, and not, as defendant maintains, only a free trip or vacation prize or award in an annual sales contest, designed simply to give the employees a pleasurable experience without any significant serious work aspects involved.

> \* \* \* \* \* \*

> Further, all qualifiers were "expected" to attend. In practical effect, they were required to attend. Those who for some reason could not attend received no "prize" money instead representing the value of the trip. When an employer to all intents and purposes directs an employee to be present at a certain place and at a certain time, the conclusion is compelled that the trip, at least from the employer's point of view, primarily serves his purposes.

To the same effect is the case of Acacia Mutual Life Insurance Company v. United States, *supra*. Citing the *Peoples Life* case, the District Court in *Acacia Mutual* also held that the payment of convention expenses to its employees did not constitute remuneration "for services performed." Section 3401 (a).[3] In a comprehensive opinion, Dis-

---

2. The court was not required to, and did not, pass upon the question of whether these convention expense payments were taxable income to the employee. The court did indicate its view that it was not proper for the defendant to use the withholding provisions "as a device \* \* \* to determine the basic tax liability of the employee, who is not even a party to the case," an observation equally pertinent here. 373 F.2d 933, 179 Ct.Cl. 334–335.

3. The court did hold that the payment of convention expenses for certain of its employees' wives constituted "wages" upon which Acacia was required to withhold. This part of the District Court's decision does not reflect a conflict with *Peoples Life* because, unlike the situation in *Peo-*

trict Judge Harvey stated the essential distinction already made above in the following language at 272 F.Supp. 195:

> The question in * * * those cases [i. e., the so-called "income type" cases], however, was whether the value of the trip was "gross income" to the employee under § 61 of the Internal Revenue Code of 1954. Here the issue is whether the expenses of the meetings represented "remuneration" under § 3401(a) paid by the employer "for services performed" by an employee. Congress could hardly have intended that the determination of the latter question would be controlled by the individual motive of each separate employee in attending the meeting. One employee might view the trip as primarily a vacation; another, more highly motivated, might see it as a means of improving his business capabilities. It should be noted that in both *Thomas* [Patterson v. Thomas, 289 F.2d 108 (5 Cir. 1961)] and *Rudolph* [Rudolph v. United States, 291 F.2d 841 (5 Cir. 1961)] ["income type" cases] the court considered the statute from the taxpayer's point-of-view. With the employer as taxpayer here, this Court concludes that *it is the purpose of the employer that controls in determining whether payments are remuneration under § 3401(a) for services performed.* [Emphasis supplied.]

■ Both *Peoples Life* and *Acacia Mutual* clearly indicate that, in contrast to the question of whether payment of moving expenses constitutes taxable income to an individual employee, where the withholding statute is involved, the matter should be viewed from the standpoint of the employer's purpose in making the payments. The record in this case is clear that Humble's payments of its employees' moving expenses were properly chargeable as ordinary and necessary expenses incurred in its trade or business and were not meant by Humble to be in any sense compensation "for services performed."

So far as I have been able to determine, England v. United States, *supra,* is the only case obliquely indicating the view that while payment of moving expenses clearly constitutes taxable income to the employee, still such payment may not fall within the term "compensation for services." That case was not a withholding case but was one involving, again, the question of whether the employee received taxable income upon reimbursement of his moving expenses. However, in its opinion holding that such reimbursement was income to the employee, the Seventh Circuit Court of Appeals stated at 345 F.2d 416:

> We agree with the Government, contrary to the district court's view, that in view of § 61(a)'s definition of gross income as "all income from whatever source derived, including (but not limited to) the following items," *the fact that the reimbursement received by England might not fall within item (1) "Compensation for services,* including fees, commissions, and similar items" is not in any way controlling. Nor is the fact, emphasized by the court, that England suffered a financial loss in the transfer to Springfield controlling as to whether the reimbursement constitutes gross income. * * *

> * * * * * *

> * * * The expense of transporting an employee to a new post of duty for benefit of the employer is properly an expense of the employer, not compensation to the employee, but the costs of meals, lodgings, and expenses incidental to securing housing at the post are personal living expenses of the employee, and if they are provid-

---

ples Life, the wives involved in the *Acacia* case performed no convention duties and did not participate in any of the business of the convention. Hence, the District Court felt that Acacia's dom-

inant purpose in making these trips available to such wives was "to offer their husbands a prize or award for services performed." 272 F.Supp. 201.

ed by the employer, income is realized thereby. [Emphasis supplied.]

While clearly not a direct holding on the point, the italicized words above do seem to indicate the Seventh Circuit's view that these payments and reimbursements of moving expenses are not compensation *for services* or, at least, that the question is irrelevant to a determination of whether the payments are income under section 61(a). Properly considered, it would seem that "compensation for services" involves a direct exchange of services performed by the employee in return for salary, bonus, and similar items. I cannot see that the moving expense payments here involved were intended to compensate the recipient-employee for services. Instead, they were incurred by Humble in the course of its ordinary business activities and to prevent its moving employees from suffering a loss. No doubt the offer to reimburse the employees was also an inducement to them to make the requested move. Without it, probably only highly paid employees would have agreed to move in order to keep their jobs. However, there is no apparent correlation between such an inducement payment and the performance of services, and it must be for the latter before withholding thereon is required.

If carried to its logical conclusion, defendant's argument here would suggest that every payment, or other economic gain, flowing from an employer to an employee constitutes compensation for services performed upon which withholding is required. Clearly, however, this is not so as shown by a number of defendant's own rulings. For example, in Rev.Rul. 59–227, 1959–2 C.B. 13, it was held that a lump-sum payment to an employee for his relinquishment of seniority rights and the vacation of a particular position, while ordinary income to

the employee, did not constitute compensation for services performed and, hence, withholding was not required. And, in Rev.Rul. 55–520, 1955–2 C.B. 393, it was held that a payment to an employee in settlement of litigation over his employment contract, while ordinary income to the employee, was not a payment for services on which withholding was required. To the same effect are Rev.Rul. 58–145, 1958–1 C.B. 360 and Rev.Rul. 58–301, 1958–1 C.B. 23.

From the foregoing observations and the state of the law in 1961, it is clear that, except for moving expense payments to its *new* employees, Humble had no reason to anticipate that withholding of income taxes from the payments involved herein was required. As will be seen, the law in this area has now been clarified.

For taxable years beginning after December 31, 1969, the question here at issue has been resolved by the Congress. By section 231 of the Tax Reform Act of 1969, P.L. 91–172, 83 Stat. 487, Congress added new section 82 to the Internal Revenue Code, which new section reads as follows: [4]

> There shall be included in gross income (*as compensation for services*) any amount received or accrued, directly or indirectly, by an individual as a payment for or reimbursement of expenses of moving from one residence to another residence which is attributable to employment or self-employment. [Emphasis supplied.]

This statutory provision applies only to taxable years beginning after December 31, 1969. Its legislative history states that as a result of its enactment and the designation by Congress of all reimbursed moving expenses as "compensation for services," employers are responsible for withholding taxes on these reimbursements. Senate Rep.No.

4. For a full discussion of this new section, including a description of the rather limited treatment of the subject by Congress in the Revenue Act of 1964, *see* Allington, Moving Expenses and Reimbursements, 56 A.B.A.J. 495 (May 1970).

A discussion of the Congressional action in 1964, as well as a comprehensive analysis of the applicable case law, is contained in Walker, Employee Meals, Lodging and Moving Expenses, 25 N.Y.U. Ann.Inst. on Fed.Taxation 529 (1967).

91–552, 91st Cong., 1st Sess. (1969) states at page 110:

> The Committee amendments also provide that reimbursements of expenses of moving from one residence to another *are to be included in the taxpayer's gross income (as compensation for services)*. Under this provision, taxpayers include the reimbursements in gross income but then are permitted to take deductions to the extent permitted under the provisions for the deduction of moving expenses.
>
> Since compensation for services is generally subject to the withholding of income tax, moving expense reimbursements *are to be subject to the general withholding rules*. However, the withholding provisions (sec. 3401(a)) are not to apply to reimbursements to the extent it is reasonable to believe that a moving expense deduction will be allowable (under section 217). [Emphasis supplied.]

Both parties to this controversy take comfort from the foregoing legislative history. The plaintiff points to the "are to be" phraseology as indicative of a Congressional action applicable only *in futuro*. To defendant, however, the enactment of Section 82 was merely declaratory of existing law.

Neither argument is persuasive, for "* * * the views of on Congress as to the construction of a statute adopted many years before by another Congress have very little, if any, significance." United States v. Southwestern Cable Co., 392 U.S. 157, 170, 88 S.Ct. 1994, 2001, 20 L.Ed.2d 1001 (1968); *see*, also, Brown v. United States, 192 Ct. Cl. 203, 426 F.2d 355 (1970). Even though, as defendant says in its supplemental brief, the "capstone is now in place," the law was anything but clear in 1961, the year at issue here.

■ The major guidance to employers provided by the Internal Revenue Service in that earlier year is to be found in Rev.Rul. 54–429, 1954–2 C.B. 53, Rev.Rul. 55–140, 1955–1 C.B. 317, and Rev.Rul. 59–236, 1959–2 C.B. 234. Two of those rulings, namely Rev.Rul. 55–140 and

Rev.Rul. 59–236, hold that payments and reimbursements to *new* employees of their moving expenses constitute income to the employee-recipient upon which withholding is required. *See,* also, United States v. Woodall, 255 F.2d 370 (10th Cir., 1958), *cert. denied*, 358 U.S. 824, 79 S.Ct. 39, 3 L.Ed.2d 64 (1958), where the Circuit Court held that such payments are income without, however, reaching the question of withholding requirements. In the present case, a very small amount (about two percent) of the moving expense payments made by Humble in 1961 were to *new* employees. With knowledge of the Service position in Rev. Rul. 59–236, *supra,* Humble should have withheld on those payments totaling a little over $46,000.

However, with respect to the great bulk of its 1961 moving expense payments to *existing* employees, Humble's prominent guideline would have been Rev.Rul. 54–429, *supra,* where it is held at 1954–2 C.B. p. 53:

> The payment or reimbursement by an employer of the cost of moving an employee, his immediate family, household goods, and personal effects from one place of employment to another permanent place of employment, *primarily for the benefit of the employer, is not compensatory in nature.* There is no essential difference between a payment of such cost directly by the employer and the payment by the employee and subsequent reimbursement by the employer. [Emphasis supplied.]

While the payments referred to are the so-called "direct" moving expense payments, and while the ruling goes on to indicate that any excess over that type of payment is includible in the employee's income, there is nothing whatever therein declaring a duty on the employer to withhold on such payments to existing employees where the move is for the benefit of the employer.

Thus, in 1961, Humble had no reason to suspect that when, for its own benefit, it reimbursed the moving expenses of its *existing* employees, it was paying them

wages "for services performed" as defined in section 3402. Under these circumstances, Humble should not be penalized and used "as a device * * * to determine the basic tax liability" of its employees who are not even parties to this case. Peoples Life Insurance Company v. United States, *supra*, 373 F.2d 933, 179 Ct.Cl. 334–335.

Defendant's expressed concern that such holding would greatly impair the effective administration of the tax laws has manifestly been mooted by the Congressional addition to the Code of new section 82 discussed above.

Plaintiff is entitled to recover with the exact amount of recovery to be determined in further proceedings under Rule 131(c).

DAVIS, Judge (dissenting in part) :

Ritter v. United States, 393 F.2d 823, 183 Ct.Cl. 875, *cert. denied*, 393 U.S. 844, 89 S.Ct. 127, 21 L.Ed.2d 115 (1968), ruled the reimbursement of "indirect" moving expenses to be taxable income to existing employees. Other courts have taken the same position. Commissioner of Internal Revenue v. Starr, 399 F.2d 675 (C.A.10, 1968); England v. United States, 345 F.2d 414 (C.A.7, 1965), *cert. denied*, 382 U.S. 986, 86 S.Ct. 537, 15 L. Ed.2d 475 (1966); Lull v. Commissioner, 51 T.C. 841 (1969); see Commissioner of Internal Revenue v. Mendel, 351 F.2d 580, 582 (C.A.4, 1965).[1] It is from this now-established baseline that we must measure the claim that this kind of reimbursement does not constitute "wages" under §§ 3401–02 of the Internal Revenue Code, *i. e.* "remuneration * * * for services performed by an employee for his employer, including the cash value

of all remuneration paid in any medium other than cash * * *."

On the precise point there are no controlling decisions. There is, likewise, very little direct comfort in the legislative history of §§ 3401–02 (or their predecessors). Nor is it easy to draw any firm principle out of the series of Internal Revenue Service rulings in this area.[2] As in *Ritter*, (see 393 F.2d at 832, 183 Ct.Cl. at 890), I am able to discern the path only by looking to the statute in the light of the relevant Supreme Court opinions. The opening through the tangle emerges from the consistent rationale of the line of decisions holding comparable kinds of payments by employer to existing employee, as such, to be taxable income to the latter.

This reiterated principle is that a payment of the type involved here—not a *bona fide* gift, a transfer for value received, reimbursement of expenses for the employer's own benefit, or a dividend —is taxable compensation for services rendered by the employee to the employer. In Old Colony Trust Co. v. Commissioner of Internal Revenue, 279 U.S. 716, 49 S.Ct. 499, 73 L.Ed. 918 (1929), the Court held employees taxable on the amount of their income taxes paid by their employers, saying "The payment of the tax by the employers was in consideration of the services rendered by the employee, and was again derived by the employee from his labor", "The taxes were paid upon a valuable consideration, namely, the services rendered by the employee and as part of the compensation therefor" (p. 729, 49 S.Ct. p. 504), and "The payment for services, even though entirely voluntary, was nevertheless compensation within the statute" (p. 730, 49 S.Ct. p. 504). Commissioner of Internal

---

1. *Cf.* Koons v. United States, 315 F.2d 542 (C.A.9, 1963); Bradley v. Commissioner of Internal Revenue, 324 F.2d 610 (C.A.4, 1963); United States v. Woodall, 255 F.2d 370 (C.A.10, 1958); Kobacker v. Commissioner, 37 T.C. 882 (1962)— all dealing with new employees.

2. See Rev.Rul. 59–371, 1959–2 Cum.Bull. 236; Rev.Rul. 59–236, 1959–2 Cum.Bull.

234; Rev.Rul. 59–227, 1959–2 Cum.Bull. 13; Rev.Rul. 58–301, 1958–1 Cum.Bull. 23; Rev.Rul. 58–145, 1958–1 Cum.Bull. 360; Rev.Rul. 55–140, 1955–1 Cum.Bull. 317; Rev.Rul. 55–520, 1955–2 Cum.Bull. 393; Rev.Rul. 54–429, 1954–2 Cum.Bull. 53; Rev.Rul. 190, 1953–2 Cum.Bull. 303.

Revenue v. Smith, 324 U.S. 177, 65 S.Ct. 591, 89 L.Ed. 830 (1945), the first stock option case, likewise spoke of "any economic or financial benefit conferred on the employee as compensation, whatever the form or mode by which it is effected", and of "compensation for services" (pp. 181, 182, 65 S.Ct. p. 593). And Commissioner of Internal Revenue v. LoBue, 351 U.S. 243, 76 S.Ct. 800, 100 L.Ed. 1142 (1956), the more recent stock option case, said that since "the employer's transfer of stock to its employee LoBue for much less than the stock's value was not a gift, it seems impossible to say that it was not compensation" and "[w]hen assets are transferred by an employer to an employee to secure better services they are plainly compensation", and "LoBue received a very substantial economic and financial benefit from his employer prompted by the employer's desire to get better work from him. This is 'compensation for personal service' within the meaning of § 22(a) [of the 1939 Code]" (p. 247, 76 S.Ct. p. 803, see also p. 248, 76 S.Ct. 800).

This is the theory behind *Ritter*—that the employer reimburses "indirect" moving expenses in order to induce his employee to stay with the company and to continue to render services [3]—and it seems to me to compel the holding that the reimbursement payments involved there and here are taxable to the employee because they are compensation for services, just like traditional wage or salary payments, and not because they are a unique or *sui generis* sort of pay-

ment falling outside of the "compensation" category but still within § 61(a). Of course, the employees gave no services while they were in the process of moving, but taxable "compensation" has never been limited to payment for work during particular time periods. See S.Rep.No.221, 78th Cong., 1st Sess., p. 28, 1943 Cum.Bull. 1314, 1335. This is proved by the tax treatment, for instance, of special bonuses, or reimbursement of income taxes, or the grant of stock options, or the supplying of a house. These same examples also prove that the services need not be already performed or done in the past; it is compensation to make a payment "to enlist more efficient service", "to secure better services", or because of "the employer's desire to get better work from" the employee. Commissioner of Internal Revenue v. LoBue, *supra,* 351 U.S. at 247, 76 S.Ct. at 803. *Cf.* Social Security Board v. Nierotko, 327 U.S. 358, 365–366, 66 S.Ct. 637, 90 L.Ed. 718 (1946). That was plainly Humble's goal in this instance.[4]

Cases like Peoples Life Insurance Co. v. United States, 373 F.2d 924, 179 Ct. Cl. 318 (1967), seem to me quite different. Those payments were not taxable to the employee and were not compensation. The employer's purpose (properly stressed in the opinions) has a part in deciding whether a payment is taxable to the employee. But when it is determined, as *Ritter* did, that the payment is taxable, that holding must also mean that the payment is not exclusively or pri-

---

3. Significantly, the court's opinion in *Ritter* quotes only the first subdivision of § 61(a), subdivision (1) relating to "Compensation for services, including fees, commissions, and similar items." 393 F.2d at 826, 183 Ct.Cl. at 880.

4. The new legislation (effective from 1970 on), in which Congress expressly designated the reimbursement of moving expenses as "compensation for services", shows that it is natural and unstrained to characterize the payments as "compensation". Sec. 231 of the Tax Reform Act of 1969, P.L. 91–172, 83 Stat. 487, adding a new § 82 to the Internal Revenue Code. I cite the statute only for this limited purpose, not as proving that Congress was simply "declaring" the existing law. As the court's opinion indicates, nothing solid as to Congress' view of the pre-existing law can be drawn from the legislative history of the new § 82 of the Code, and it would be fruitless to try to divine from that history whether Congress thought it was declaring, clarifying, or changing the law. But it *is* pertinent to point out that Congress did not hesitate to call these payments "compensation".

marily for the employer's own purposes or benefit.[5]

At the bottom of the opposition to the Government's position, it seems to me, is the feeling that the withholding provisions of §§ 3401–02 should be restrictively read because the Federal Government is imposing on the employer the involuntary and unpaid role of tax collector, and at the same time is attempting for its own convenience to garner the employees' taxes from their employer. My difficulty with that predicate is that, whatever differing views citizens can take on the *withholding* device, Congress has unequivocally adopted and maintained it for almost thirty years. There is no legislative indication that §§ 3401–02 are to be given a niggardly reading while their counterpart, § 61(a), is to be read broadly. On the contrary, both provisions seem to have been viewed all along as *in pari materia*, with the withholding sections aimed at collecting all the compensation which employees must report as income, except where specific exceptions have been made. See H.Rep.No. 401, 78th Cong., 1st Sess., pp. 2, 8–11 (1943 Cum.Bull. 1283, 1288–90); S.Rep. No.221, 78th Cong., 1st Sess., p. 1 (1943 Cum.Bull. 1314); § 213(a) and (c) of the Revenue Act of 1964, P.L. 88–272, 78 Stat. 19. I think we should apply that Congressional policy here.[6]

## FINDINGS OF FACT

1. The plaintiff is a corporation organized and existing under the laws of the State of Delaware and has its principal office at 800 Bell Avenue, Houston, Texas. The plaintiff's principal business is producing, refining, transporting, buying and selling crude petroleum and petroleum products at wholesale and retail.

2. The plaintiff timely filed its Federal employment tax returns for the cal-endar year 1961, and timely paid the tax liability shown thereon. Thereafter, the Commissioner of Internal Revenue assessed a deficiency in withholding taxes against the plaintiff in the amount of $590,416.60 for 1961.

3. On December 14, 1964, the plaintiff paid the $590,416.60 deficiency assessed plus $116,607.28 interest thereon, and, in March 1965, received a refund of $1,666.12 representing an overpayment of interest. The plaintiff timely filed a claim for refund in the amount of $705,-357.76 on the grounds that (1) the Commissioner of Internal Revenue had erroneously determined that certain moving expense payments made in 1961 by the plaintiff to or on behalf of its employees were "wages" as defined by section 3401 of the Internal Revenue Code, and (2) the Commissioner of Internal Revenue had also erroneously determined that the plaintiff was required in 1961 to withhold taxes on such payments and was liable for a tax of $500,353.04 for failure to withhold taxes.

4. The defendant has administratively refunded a part of the deficiency and assessed interest. The amount of the deficiency remaining in controversy is $500,353.04 plus assessed interest thereon. The Commissioner of Internal Revenue assessed this deficiency in withholding taxes against the plaintiff on the ground that the plaintiff should have withheld taxes on $2,779,739.23 which it paid in 1961 to or on behalf of its employees incident to their moving to new places of employment. The Commissioner of Internal Revenue arrived at the $500,353.04 tax deficiency by taxing these payments at the rate of 18 percent.

## EXISTING EMPLOYEES

5. During the period in question, the plaintiff maintained offices in numerous

---

5. Insofar as Peoples Life may possibly suggest by implication (see 373 F.2d at 932–933, 179 Ct.Cl. at 332–334) that, apart from the effect of specific revenue regulations, *reimbursement of expenses* can readily constitute income to the employee while still falling outside the category of "wages" for withholding purposes, I would now disagree.

6. It goes without saying that I agree with the court that plaintiff is liable for the tax on the reimbursement of the moving expenses of new employees.

locations throughout the United States. In order to meet its business requirements at these locations, the plaintiff from time to time needed the services of various of its employees at locations different from those at which the employees had previously been working. When this occurred, a representative of the plaintiff asked the employee to move and take up work at the new location, and stated to him the plaintiff's offer of employment at the new location and the alternatives open to the employee. Sometimes the employee's old job was available to him only in the new location and only a lesser position, or none at all, was open at the old location. Sometimes the employee was offered a better position or a higher salary at the new location. In either case, the plaintiff offered to pay or reimburse the employee for various expenses incident to moving to the new place of employment, if the employee moved to the new location and began work for plaintiff there. The particular reimbursements and payments plaintiff offered to make, and the conditions under which they were to be made, were set forth in the "Temporary Resettlement Policy Effective for the Year 1961." This policy had company-wide application.

6. Plaintiff corporation resulted from a 1959 merger of Esso Standard Oil Company, Carter Oil Company, and Humble Oil & Refining Company, a Texas corporation. In 1960, plaintiff decided to move the entire New York City headquarters' operation of the former Esso Standard Oil Company to Houston, Texas. This move of the Esso operation from New York took place in 1961. In order to achieve the move with as little disruption as possible, plaintiff requested hundreds of its employees, both managerial and clerical, to move from New York to Houston. The employees were advised that the company, under its resettlement policy, would either directly pay for, or reimburse the employees, for the bulk of their expenses incurred in moving. As one witness described it, the company policy was to make the moving employee "whole" to the end that he would not be "out of pocket to a great extent."

The resettlement policy, which was adopted in 1961 on a company-wide basis, was the same policy which had been used by Esso Standard Oil Company since at least 1953. The resettlement policies of Carter Oil Company and Humble Oil & Refining Company of Texas, prior to the merger and up to 1961, were less liberal, in that they provided reimbursement for only direct moving costs, whereas plaintiff's resettlement policy also provided reimbursement for many types of indirect costs.

Most of the people in the New York office had never moved at the company's request before, but they were well aware of the Esso policy to reimburse its employees for most of their moving expenses.

7. From the testimony of a number of plaintiff's employees, it is apparent that the primary motivating factor in their agreeing to move from New York to Houston was the fact that their job was being moved to Houston, and they desired to continue their employment with plaintiff. Not much thought was given to the matter of moving expenses, since they knew that plaintiff would take care of those expenses for the most part. Of course, plaintiff was aware that its resettlement policy made the employee's decision easier and constituted an added inducement to move. From plaintiff's standpoint, its policy of paying employee moving expenses constituted ordinary and necessary business expenses which helped the company to retain the services of experienced and competent employees.

8. As a further aid to its employees in arriving at their decision, plaintiff caused to be prepared a 17-page booklet entitled *Welcome to Houston* which af-

forded a great deal of information about Houston, its housing, churches, schools, weather and other matters. One and a half pages of the booklet were devoted to a discussion of the logistics and costs of moving, and plaintiff explained:

When you pick up and move your entire household from one city to another, there is a good bit of cost involved. When the Company transfers you, it expects to bear the reasonable costs of the move, and has an established policy, known as the Resettlement Policy, that sets up the guidelines for all transfers. Your supervisor in your new job will talk to you in detail about how this policy will affect you, but here is a general summary of the provisions of the policy. (For permanent transfers only.)

Also, the booklet described the problems incident to selling and buying homes, and explained the extent to which plaintiff would reimburse an employee who suffered a loss in selling his old house. Meetings were held in New York, to which the employees were invited in groups of about 50 each. At the meetings, further information was given about living and working conditions in Houston and employees' questions were answered. At these meetings and on other occasions, the employees were assured that plaintiff would pay or reimburse them for certain costs connected with their transfer from New York to Houston. In Houston, a man was assigned full-time to greeting the newcomers and helping them in adjusting to their new environment.

9. The plaintiff did not request any commitment from an employee who was being transferred that he would continue working for the plaintiff for any stated period of time after the employee moved and received reimbursement for moving expenses under the resettlement policy. It was not thought necessary to do so because any employee who moved to Houston obviously intended to keep his job with the company. The only commitments in effect during 1961 were certain employment contracts signed by professional and technical employees which required 60 to 90 days' notice of termination if an employee wished to terminate his employment. These contracts also bound the plaintiff to provide the same notice if it wished to terminate an employee's employment. The contracts were in effect whether or not an employee was transferred.

10. In addition to the movement of its employees from New York to Houston plaintiff also moved between five to seven hundred other employees from one location to another in 1961, in individual moves. This is a normal incident of plaintiff's business, and the 1961 resettlement policy applied to those moves also.

Plaintiff never asked an employee to move, unless it needed and wanted his services elsewhere. The expenses of moving employees were charged to the operational expenses of the department receiving the employee in order to insure that moves were not made unless the receiving department actually needed his services.

## NEW EMPLOYEES

11. Also, in order to meet its business requirements at various locations, the plaintiff from time to time needed the services of various persons who had not been previously employed by the plaintiff, and who had previously been living in places different from the locations in which the plaintiff wanted them to work. When this occurred, a representative of the plaintiff asked the prospective employee to move and take up work with the plaintiff at the new location. The representative of the plaintiff stated the nature and terms of the employment offered, and informed the prospective employee of the plaintiff's offer to pay, or reimburse him for, various moving ex-

penses if the employee moved to the new location and began work for the plaintiff there. The resettlement policy had no application to these new employees, but was applicable only to regular employees transferring from one unit of the company to another. New employees (generally college recruits) were paid only direct moving expenses from their home or college location to their first work assignment.

## PAYMENTS AND REIMBURSE-MENTS MADE

12. When an existing employee moved and took up his work with the plaintiff in the new location, the plaintiff made the reimbursements and payments set out in the resettlement policy as it had agreed. The moving expenses were sometimes paid directly by the plaintiff, and sometimes paid by the employee who was thereafter reimbursed by the plaintiff. The payments which the plaintiff made to or on behalf of its new and existing employees for 1961 can be separated into the following categories:

(a) Expenses incurred by new employees: Expenditures for moving household goods and personal effects to new locations, transportation of families to the new locations, and meals and lodging en route to the new locations _____ $46,130.98

(b) Expenses incurred by existing employees in moving themselves, their immediate families, and household goods and personal effects to the new locations _____ 1,945,438.23

(c) Expenses incurred by existing employees in the sale of their residences: Brokers' commissions, expenditures in preparing residences for sale, costs of advertising, deed costs, mortgage prepayment penalties, closing costs and fees _____ 959,205.43

(d) Expenses incurred by existing employees in purchasing new residences: House-hunting trips, interest on loans, expenditures for acquiring mortgages and securing title policies, recording fees, loan papers, credit reports, surveys, restrictions, escrow fees, closing costs and fees _____ 443,224.03

(e) Expenses incurred by existing employees in occupying new residences: Installation of appliances, refitting rugs and drapes, painting, decorating and carpentry _____ 240,711.80

(f) Other expenses incurred by existing employees: Interim living expenses, expenses of interim trips to new locations, and miscellaneous expenses _____ 767,109.89

(g) Amounts paid to existing employees representing in the case of each employee to whom payment was made, an amount equal to 75 percent of the excess of an appraised value of the employee's old house over its actual selling price (provided that the employee placed his house for sale on multiple listing, or with two or more brokers, and then was unable to sell the house for as much as its appraised value) _____ 323,357.10

13. With respect to the amounts paid to existing employees referred to in finding 12(g), the appraised value was fixed by the plaintiff on the basis of two independent appraisals obtained by the plaintiff. The plaintiff maintained a list of independent professional appraisers and from this list would select two appraisers. The appraisers would be requested to submit an appraisal on a form developed by the plaintiff and bill the plaintiff for the appraisal cost. If there was a wide difference between the first two appraisals, a third appraisal would be obtained. There was no specified time that an employee had to keep his house on the market before he could sell for a price that was less than the appraised value; however, each employee was advised that before he entered into such a contract for sale he should get approval of the sale from his supervisor. In some cases where an employee received low offers, it was felt necessary to provide guidance to the employee. The plaintiff would not approve the sale and would recommend changing real estate brokers or would point out that the appraisals were fair indications of the market price and that it was reasonable to wait until an offer at or close to the market price was received.

14. The expenses incident to moving to the new place of employment referred to in finding 12 were incurred because of moves that the plaintiff's employees made at the plaintiff's request and pursuant to its offers to pay or reimburse the employees as described above. The amount upon which the Commissioner of Internal Revenue assessed withhold-

**1376**

ing tax was the $2,779,739.23 itemized in subparagraph (a) and subparagraphs (c) through (g) of finding 12; no withholding tax was assessed upon the amount set out in subparagraph (b) of finding 12.

15. The plaintiff is in the petroleum industry where employees are often moved for plaintiff's convenience from one location to another in the normal course of doing business. As a result the plaintiff developed its resettlement policy to cover expenses which it considered to be ordinary and necessary business expenses and which should be assumed by an employer. The plaintiff paid all the expenses itemized in subparagraphs (a) through (g) of finding 12 because it was the plaintiff's experience that these are the type of expenses which would normally be incurred by its employees in moving from one location to another. However, its employees incurred additional expenses incident to a move which were not covered by the resettlement policy, and these amounts were not paid or reimbursed by the plaintiff.

16. It has been the plaintiff's compensation policy to pay a salary to each employee according to the value of his services and to maintain uniform salaries throughout the company for employees who perform similar services. As a result, the plaintiff has kept its compensation policy completely separate and distinct from its resettlement policy. Neither the plaintiff nor its employees considered the payments made under the plaintiff's resettlement policy to constitute remuneration for services.

## CONCLUSION OF LAW

Upon the foregoing findings of fact and opinion, which are adopted by the court and made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover, and judgment is entered to that effect, with the determination of the amount of recovery to be reserved for further proceedings under Rule 131(c) in accordance with this opinion.